George A. Kimbrell (WSB No. 36050)
Jennifer Loda (*pro hac vice*)
Meredith Stevenson (*pro hac vice*)
Center for Food Safety
303 Sacramento Street, 2F
San Francisco, CA 94111
T: (415) 826-2770
gkimbrell@centerforfoodsafety.org
jloda@centerforfoodsafety.org
mstevenson@centerforfoodsafety.org

*Counsel for all Plaintiffs*

Marianne Cufone (*pro hac vice*)
Recirculating Farms Coalition
5208 Magazine St., #191
New Orleans, LA 70115
T: (813) 785-8386
mcufone@recirculatingfarms.org

*Counsel for Plaintiffs Recirculating
Farms Coalition and Don't Cage Our
Oceans*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| DON'T CAGE OUR OCEANS; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; QUINAULT INDIAN NATION; LOS ANGELES WATERKEEPER; SAN DIEGO COASTKEEPER; SANTA BARBARA CHANNELKEEPER; WILD FISH CONSERVANCY; RECIRCULATING FARMS COALITION; CENTER FOR FOOD SAFETY,<br><br>　　　*Plaintiffs,*<br><br>　　vs.<br><br>U.S. ARMY CORPS OF ENGINEERS, an agency of the United States; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his Official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,<br><br>　　　*Defendants.* | Case No. 22-1627<br><br><br>**COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF** |

COMPLAINT
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1

**TABLE OF CONTENTS**

2   GLOSSARY ......................................................................................... iii

3   INTRODUCTION AND SUMMARY ...................................................... 1

4   JURISDICTION AND VENUE .............................................................. 7

5   PARTIES .............................................................................................. 8

6   LEGAL BACKGROUND ...................................................................... 22

7       I.     RIVERS AND HARBORS ACT ................................................. 22

8       II.    OUTER CONTINENTAL SHELF LANDS ACT ........................ 25

9       III.   THE PROPERTY CLAUSE ...................................................... 27

10      IV.   NATIONAL ENVIRONMENTAL POLICY ACT ....................... 27

11      V.    ENDANGERED SPECIES ACT ............................................... 30

12      VI.   MAGNUSON-STEVENS ACT ................................................. 34

13      VII.  ADMINISTRATIVE PROCEDURE ACT ................................ 36

14  FACTUAL BACKGROUND .................................................................. 37

15      I.     INDUSTRIAL FINFISH AQUACULTURE ............................ 37

16          A.   Environmental and Public Health Impacts ............................ 38

17          B.   Wildlife Impacts ...................................................................... 47

18          C.   Socioeconomic Impacts ........................................................... 50

19      II.    OFFSHORE AQUACULTURE REGULATION PRIOR TO NWP 56 ... 51

20          A.   Gulf of Mexico Litigation ....................................................... 53

21          B.   May 2020 Executive Order ..................................................... 54

22      II.    NATIONWIDE PERMIT 56 ..................................................... 55

23          A.   Proposed NWP 56 .................................................................... 55

24          B.   Public Comments ..................................................................... 58

25          C.   Final NWP 56 Issuance ........................................................... 60

26             i.   Changes to the Final Decision ........................................... 61

27

COMPLAINT – i
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

ii.     Wildlife Impacts ................................................... 65

ii.     Wildlife Impacts ................................................... 65

iii.    Environmental Impacts ...................................... 66

iii.    Environmental Impacts ...................................... 66

iv.     Cumulative Impacts .......................................... 67

v.      General Conditions ........................................... 68

vi.     Regional Conditions ......................................... 69

FIRST CLAIM FOR RELIEF .................................................. 74

SECOND CLAIM FOR RELIEF ............................................. 76

THIRD CLAIM FOR RELIEF ................................................. 78

FOURTH CLAIM FOR RELIEF ............................................. 81

FIFTH CLAIM FOR RELIEF .................................................. 84

SIXTH CLAIM FOR RELIEF .................................................. 86

PRAYERS FOR RELIEF ........................................................ 87

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

# GLOSSARY

APA – Administrative Procedure Act

CWA – Clean Water Act

EEZ – Exclusive Economic Zone

EFH – Essential Fish Habitat

EIS – Environmental Impact Statement

EPA – Environmental Protection Agency

ESA – Endangered Species Act

FADs – Fish Aggregating Devices

FONSI – Finding of No Significant Impact

FWS – U.S. Fish and Wildlife Service

MSA – Magnuson-Stevens Act

NEPA – National Environmental Policy Act

NMFS – National Marine Fisheries Service

OSCLA – Outer Continental Shelf Lands Act

PCN – Preconstruction Notice

RHA – Rivers and Harbors Act

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1  Plaintiffs Don't Cage Our Oceans, Pacific Coast Federation of Fishermen's

2  Associations, Institute for Fisheries Resources, Quinault Indian Nation, Los Angeles

3  Waterkeeper, San Diego Coastkeeper, Santa Barbara Channelkeeper, Wild Fish

4  Conservancy, Recirculating Farms Coalition, and Center for Food Safety (Plaintiffs)

5  on behalf of themselves and their members, allege as follows:

## INTRODUCTION AND SUMMARY

7       1.    This is a civil action for declaratory and equitable relief challenging the

8  United States Army Corps of Engineers' (the Corps) decision to issue Nationwide

9  Permit 56 (NWP 56), authorizing industrial finfish aquaculture structures in federal

10  waters. U.S. Army Corps of Eng'rs, *Decision Document NWP 56*, at 1 (Jan. 2021)

11  (Decision Document), Ex. A. Specifically, NWP 56 allows aquaculture operations to

12  install cages, net pens, anchors, floats, buoys, and other similar structures in

13  marine, estuarine, and waters overlaying the Outer Continental Shelf. *Id.* This

14  decision marks the first time the Corps has issued a nationwide permit for industrial

15  finfish aquaculture development in United States waters, on the Outer Continental

16  Shelf.

17       2.    Industrial aquaculture remains a controversial industry in the United

18  States and abroad due to its plethora of well-known adverse environmental and

19  intertwined socioeconomic consequences. These adverse impacts include but are not

20  limited to: disease and parasite spread from aquaculture facilities to wild fish and

21  other wildlife; fish escapes from aquaculture facilities into surrounding ecosystems;

22  water quality degradation from aquaculture inputs (e.g., antibiotics, pesticides,

23  fungicides) and outputs (fish feed and feces); the privatization of public ocean

24  resources; threats to marine life and marine ecosystems; market displacement and

25  price competition from cheaply produced farmed fish; adverse economic effects on

26

27

COMPLAINT – 1
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1  fishing businesses; and trickle-down effects to communities and families that depend

2  on healthy wild fish stocks and ocean ecosystems for their livelihoods.

3      3.      Defendants' issuance of NWP 56 now threatens to streamline

4  permitting structures for these facilities in U.S. waters for the first time. The

5  authorization of industrial aquaculture structures nationwide creates significant

6  short- and long-term risks to U.S. fisheries, ocean environments, and coastal

7  communities.

8      4.      The challenged NWP 56 resulted from a May 2020 Executive Order

9  titled "Promoting American Seafood Competitiveness and Economic Growth," which

10  required the Corps to issue NWP 56 as part of a push to streamline the industrial

11  aquaculture industry's development in the United States and increase seafood

12  production.[1] Defendants, acting under their assumed authority under the Executive

13  Order and the Rivers and Harbors Act (RHA), issued NWP 56 on January 13, 2021.

14      5.      However, Defendants' authority under the RHA on the Outer

15  Continental Shelf is not unlimited. Section 4(f) of the Outer Continental Shelf Lands

16  Act (OSCLA) grants the Corps authority to permit structures on the Outer

17  Continental Shelf only for specific activities such as oil, gas, and mineral

18  development, and renewable energy, as specified in the OSCLA. *See* 43 U.S.C. §

19  1333(a), (f); 33 C.F.R. § 320.2(b). And these general permits under RHA § 10 must

20  not have more than minimal adverse impacts, individually or cumulatively. 33

21  C.F.R. § 322.2(f).

22      6.      Plaintiffs bring this action pursuant to the Property Clause of the

23  Constitution, U.S. Const. art. 4, § 3, cl. 2; the RHA, 33 U.S.C. § 403; the OCSLA, 43

24  U.S.C. § 1333(a)(1), (e); the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544;

25  the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370m; the

26

27      [1] Executive Office of the White House, Promoting American Seafood
Competitiveness and Economic Growth, Executive Order 13921 (May 7, 2020).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Magnuson-Stevens Act (MSA), 16 U.S.C. § 1855; and the Administrative Procedure Act (APA), 5 U.S.C. § 702. The challenged decision violates these statutes for a multitude of reasons.

7.     <u>First</u> and foremost, Defendants' decision is unlawful because the Corps does not have statutory authority to undertake it. Namely, Congress has not granted authority to the Corps—or to any agency—to authorize the construction and operation of offshore aquaculture facilities on the federally-controlled Outer Continental Shelf. The Constitution vests Congress with plenary power over federal lands. Although Congress has enacted statutes authorizing the issuance of leases, easements, rights-of-way, and other grants to use, extract, and/or exploit various resources on the Outer Continental Shelf—e.g., oil, gas, and mineral extraction, deepwater ports, and renewable energy facilities—Congress has never authorized the issuance of permits, grants, or other instruments to allow the use of the Outer Continental Shelf or its resources for the purpose of industrial aquaculture. Yet, despite the fact that no statute grants the Corps the authority it seeks to exercise, the Corps issued NWP 56, which purports to authorize the installation of industrial aquaculture projects on the Outer Continental Shelf that have serious, well-documented adverse environmental and socioeconomic impacts. These impacts will infringe on the federal property interests in the Outer Continental Shelf and its resources and will interfere with Congress's interest in regulating the disposition of federal lands. Hence, the Corps' authorization of structures that will infringe upon this federal property interest violates the Property Clause of the Constitution, contravenes the separation of powers doctrine, and is *ultra vires* in violation of the Corps' statutory authority. Relatedly, the Corps' authorization of the use of federal property absent Congressional authorization is arbitrary, capricious, and not in accordance with law, contrary to constitutional right, power, or privilege, and in excess of statutory jurisdiction, authority, or limitations, in violation of the APA, 5

COMPLAINT – 3
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

U.S.C. § 706(2). For these reasons and those set forth below, Plaintiffs seek a declaration that Defendants' NWP 56 for offshore aquaculture is *ultra vires* and infringes on the federal property interest and an order vacating NWP 56.

8.  <u>Second</u>, relatedly, the Corps' failure to meaningfully consider the effects that NWP 56 will have on the federal property interest is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2). Pursuant to the Corps' own regulations, a Section 10 permit authorizes only the construction of an obstruction to navigation on the Outer Continental Shelf; it does not confer the necessary property rights to construct or operate the proposed structure, nor does it authorize injury to the property rights and interests of another. *See* 33 C.F.R. § 330.4(b); *accord* 86 Fed. Reg. 2744, 2875 (Jan. 13, 2021) ("NWPs do not grant any property rights or exclusive privileges."). As explained, and as the Corps is well aware, there exists no mechanism by which private entities can obtain a permit or license to construct and operate an industrial aquaculture facility on the federally-controlled Outer Continental Shelf. Yet, in its public interest review, the Corps insists that NWP 56 is "consistent" with the public interest, because "[i]n federal waters on the outer continental shelf, the project proponent may be required to obtain a lease or other form of permission from the Department of Interior." Ex. A at 77. The Corps' reliance on this conclusory statement to avoid grappling with the impacts of its action on the federal property interest is the essence of arbitrary and capricious decisionmaking. For these reasons and those set forth below, Plaintiffs seek a declaration that Defendants' NWP 56 for offshore aquaculture is arbitrary and capricious in violation of the APA and an order vacating and remanding the rule.

9.  <u>Third,</u> and alternatively, Defendants violated their own regulations under the RHA in issuing NWP 56 for facilities that will cause more than "minimal individual and cumulative environmental impacts." 33 C.F.R. § 322.2(f). The Corps' decision that NWP 56 will cause only "minimal individual and cumulative

COMPLAINT – 4
Case No. 22-1627

environmental impacts" is arbitrary and capricious, because the Corps did not adequately consider aquaculture impacts. Rather, the Corps punted the duty to assess aquaculture impacts to district engineers, stating they can add mitigation measures to address physical, chemical, and biological changes to marine and estuarine waters from the aquaculture facilities' operation. Yet, although the Corps' regional districts must attach regional conditions to keep adverse impacts in a particular region under the minimal threshold, or forgo these nationwide permits altogether, the majority of the sixteen districts that adopted NWP 56 did so without any regional conditions beyond those established at the federal level. These failings render Defendants' decision arbitrary and capricious, and contrary to law, in violation of the RHA and the APA.

10.    <u>Fourth</u>, Defendants violated NEPA by failing to take the required "hard look" at the significant adverse direct, indirect, and cumulative impacts of their decision. Defendants failed to sufficiently consider the full range of cumulative impacts, and in some cases failed to address certain impacts at all; improperly deferred consideration of reasonably foreseeable impacts to district engineers at a later stage of the permitting process; made numerous conclusions that directly contradicted or ignored the evidence before the agency; and failed to adequately support the efficacy of mitigation measures it relied on for its Finding of No Significant Impact (FONSI). These failings render Defendants' decision arbitrary and capricious, and contrary to law, in violation of NEPA and the APA.

11.    <u>Fifth</u>, Defendants violated the ESA by failing to ensure that NWP 56 is not likely to jeopardize the continued existence of any threatened or endangered species and also is not likely to result in the destruction or adverse modification of the critical habitat of any protected species. Despite acknowledging that NWP 56 may harm wildlife through entanglement in net pens or lines, fish escapes, pesticide and chemical use, and the release of fish waste and unconsumed fish feed,

COMPLAINT – 5
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Defendants violated the ESA by erroneously concluding that NWP 56 would have "no effect" on protected species, and failing to engage in programmatic consultation under the ESA Section 7. Defendants' ESA decisions failed to lawfully consider and analyze all of NWP 56's direct, indirect, interrelated, interconnected, and cumulative effects on protected species and their critical habitats; and unlawfully relied on later, case-by-case permitting decisions to purportedly fulfill the Corps' duties to ensure no jeopardy to endangered species or adverse modification of critical habitat from this action. These failings render Defendants' decision arbitrary and capricious, and contrary to law, in violation of the ESA and the APA.

12.     And <u>sixth</u>, Defendants violated the MSA by failing to consult on impacts to Essential Fish Habitat (EFH) at a programmatic level. Again, Defendants acknowledged numerous impacts to wild fish, including fish escapes, water pollution, and disease transfer. But instead of completing programmatic consultation, the Corps punted its responsibility to consult on EFH to district engineers when reviewing case-by-case permitting decisions. These failings render Defendants' decision arbitrary and capricious, and contrary to law, in violation of the MSA and the APA.

13.     For these reasons, Plaintiffs seek declaratory and equitable relief, declaring that Defendants violated the RHA, the Property Clause of the Constitution, NEPA, the ESA, the MSA, and the APA, and vacating the challenged NWP 56 as unlawful, arbitrary and capricious agency action; as well as any other equitable, declaratory, and other relief this Court deems appropriate.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question); § 1346(a)(2) (United States as defendant); § 1361 (action to compel officer of the United States to perform his or her duty); § 2201 (authorizing declaratory relief); and § 2202 (authorizing injunctive relief and any other "necessary or proper relief"); and 5 U.S.C. § 702 (judicial review of agency action under the APA). This action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–706; OCSLA, 43 U.S.C. §§ 1331 *et seq.*; NEPA, 42 U.S.C. §§ 4321–4370m; ESA, 16 U.S.C. §§ 1531–1544; RHA, 33 U.S.C. § 403; and MSA, 16 U.S.C. § 1855. An actual, justiciable controversy exists between Plaintiff and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 (declaratory relief) and 5 U.S.C. § 702 (APA).

15.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because one or more Plaintiffs reside in this district, and pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated, in this district.

16.     Specifically, venue is proper in this Court because the Seattle District is among the sixteen of seventeen Army Corps districts encompassing marine waters that has adopted NWP 56. Numerous Plaintiffs have members residing in the Seattle District, including the Quinault Indian Nation, which is located in the Seattle District. And the Seattle District is one of at least two districts that has already received a preconstruction notice (PCN) from at least one facility seeking to utilize NWP 56.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

17.     Plaintiffs provided the Corps with a 60-day notice letter outlining the Corps' ESA violations on June 22, 2022, in accordance with 16 U.S.C. § 1540(g). *See* Ex. B.

## PARTIES

18.     Plaintiff **Center for Food Safety (CFS)** is a public interest, nonprofit organization whose mission is to empower people, support farmers, and protect the earth from the adverse impacts of industrial food production. CFS has more than one million members across the country, including nearly 35 thousand in Washington State, and offices in Portland, Oregon; San Francisco, California; and Washington, D.C. CFS is a recognized national leader on the issue of industrial agriculture and its impacts to public health and the environment, utilizing regulatory actions, citizen engagement, legislation, and, when necessary, litigation, to protect transparency and accountability in food production. CFS also acts as a watchdog by ensuring that federal agencies with regulatory authority over aspects of food production, such as the Corps here, comply with their statutory mandates as well as other federal laws.

19.     CFS has long had an aquaculture program, including numerous policy, scientific, and legal staff, dedicated to addressing the adverse environmental and public health impacts of industrial aquaculture. CFS strives to improve oversight and regulation of aquaculture operations by promoting policy and cultural dialogue between regulatory agencies, policymakers, and legislators and affected groups, including residents, consumers, chefs, and environmental advocates, to protect public health and the environment from industrial aquaculture, including specifically finfish aquaculture, and to promote and protect more sustainable alternatives.

20.     Specifically, regarding another nationwide permit for shellfish aquaculture, in 2017, CFS actively engaged with the Corps on the proposed

COMPLAINT – 8
Case No. 22-1627

reissuance of NWP 48, including the submission of several comments urging the Corps to forgo adopting NWP 48. When the Corps issued 2017 NWP 48, CFS brought a lawsuit in this Court challenging the Corps' compliance with the Clean Water Act (CWA), NEPA, ESA, and the APA. *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354 (W.D. Wash. 2019). This Court vacated and remanded that permit to the Corps to comply with the CWA and NEPA, 466 F. Supp. 3d 1217 (W.D. Wash. 2020), and the Ninth Circuit affirmed. 843 F. App'x 77 (9th Cir. 2021). When the Corps first announced that it planned to reissue NWP 48 in September 2020, CFS commented on the draft permit and filed a case in December 2021 again urging the Corps to follow the CWA, NEPA, and the ESA, as well as this Court's order. *See* Center for Food Safety, et al., Comments Submitted on Proposal to Reissue and Modify Nationwide Permits, COE-2020-0002 (Nov. 16, 2020), COE-2020-002-0381; *see also Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. 21-01685-JCC-DWC (W.D. Wash. 2021).

21.     CFS also served as the lead litigator in a recent challenge to industrial finfish aquaculture in the Gulf of Mexico. In 2018, CFS, along with other conservation and fishing groups, successfully challenged NMFS's authority to regulate aquaculture in federal waters under the MSA. *See Gulf Fishermens Ass'n v. NMFS*, 341 F. Supp. 3d 632 (E.D. La. 2018). In August 2020, the Fifth Circuit Court of Appeals affirmed the lower court's decision to vacate the nation's first commercial aquaculture permitting scheme in the Gulf of Mexico and concluded that the MSA "unambiguously precludes the agency from creating an aquaculture regime." *Gulf Fishermens Ass'n v. NMFS*, 968 F.3d 454 (5th Cir. 2020). And specifically, regarding the challenged action here, CFS actively engaged with the Corps on the proposed issuance of NWP 56, submitting comments urging the Corps to forgo issuing NWP 56 to protect ocean waters, local fisheries, and endangered species from industrial aquaculture. CFS members live and work in areas that would be affected by

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

commercial finfish aquaculture, including the Gulf of Mexico, southern California, and near Oak Harbor, Washington, and are harmed by the expansion of industrial finfish aquaculture.

22.     Plaintiff **Don't Cage our Oceans (DCO2)** is a diverse coalition of fishing men and women, coastal businesses, food rights groups, marine conservation organizations, and others, who seek to protect the ocean from the significant risks of large-scale marine finfish aquaculture operations. DCO2 works to stop the development of offshore finfish farming in the United States through federal law, policy, and coalition building. DCO2 also uplifts values-based seafood systems led by local communities. DC02 has twenty member organizations, seeking to protect ocean ecosystems from Alaska to the Gulf of Mexico, with at least 4 million members nationwide.

23.     Plaintiffs **Pacific Coast Federation of Fishermen's Associations (PCFFA)** and **Institute for Fisheries Resources (IFR)** are two sister organizations involved in commercial fishing and fisheries conservation and research. The PCFFA is the largest trade organization of commercial fishing men and women on the West Coast. PCFFA uses public education and litigation to advocate on behalf of both fishing communities and fishery resources to ensure the commercial fishing industry's long-term survival.

24.     PCFFA is organized as a federation of 17 different local and regional independent (and legally separate) commercial fishing port associations, seafood marketing associations, and type-of-vessel owner associations collectively representing approximately 750 family commercial fishing businesses in California, Oregon, and Washington. California ports in which PCFFA has active member associations include the Ports of Santa Barbara, Port San Luis, Monterey, Santa Cruz, Moss Landing, Half Moon Bay, San Francisco, Oakland/Berkeley, Bodega Bay, Fort Bragg, Eureka, and Crescent City, while Oregon ports include the Port of

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1    Astoria, with at-large members in other Oregon ports. PCFFA's main Washington

2    member association is the Coastal Trollers Association, the largest Washington

3    State commercial salmon fishing boat owner's organization. These various member

4    associations generally include small and midsized commercial family fishing boat

5    owner-operators, who derive all or part of their income from the commercial

6    harvesting of Pacific salmon, groundfish, rockfish, tuna, and many other fish species,

7    as well as Dungeness crab, caught from Pacific Ocean waters along the Outer

8    Continental Shelf and in the mid-Pacific ocean.

9         25.    The IFR is a nonprofit organization with headquarters in San

10   Francisco, California. Established in 1993 by PCFFA, IFR is responsible for meeting

11   the fishery research and conservation needs of working men and women in the

12   fishing industry and executes PCFFA's expanding fish habitat protection program.

13   From its inception, IFR has helped fishing men and women in California and the

14   Pacific Northwest address salmon protection and restoration issues. IFR's members,

15   most of whom are commercial salmon fishermen or women, have personal interests

16   in the restoration of salmon fisheries. Members of PCFFA associations are also

17   considered individual members of IFR, which has an overlapping Board and staff

18   with PCFFA and which shares PCFFA's office facilities in San Francisco, California

19   and Oregon. IFR directs, manages, and funds PCFFA-originated fisheries habitat

20   conservation, restoration, and sustainable fisheries programs, in particular its

21   salmon conservation, education, and advocacy programs in Washington, Oregon, and

22   California.

23        26.    Plaintiff **Quinault Indian Nation** is a federally-recognized Indian tribe

24   and sovereign nation consisting of the Quinault and Queets tribes and descendants

25   of five other coastal tribes: Quileute, Hoh, Chehalis, Chinook, and Cowlitz. The

26   Quinault Reservation is located in the southwestern corner of the Olympic Peninsula

27   in Washington State and is comprised of 208,000 acres of mostly forested land, thirty

COMPLAINT – 11
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

miles of unspoiled Pacific coastline, and thousands of miles of rivers and streams. The Quinault have been called the Canoe People because of the primacy of the ocean, bays, estuaries, and rivers to every aspect of tribal life.

27.     The Quinault Indian Nation is a signatory to the Treaty of Olympia (1856) in which it reserved a right to take fish at its "usual and accustomed fishing grounds and stations" and the privilege of hunting and gathering, among other rights, in exchange for ceding lands it historically roamed freely. Treaties create a special fiduciary duty and trust responsibility upon all agencies of the United States and states to protect treaty rights, including fishing rights. *See Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). In the landmark "Boldt decision," a federal court confirmed that Indian tribes, including the Quinault Nation, have a right to half of the harvestable fish in state waters and established the tribes as co-managers of the fisheries resource within Washington state. *United States v. State of Wash.*, 384 F. Supp. 312, 344-45, 374-75 (W.D. Wash. 1974). The Boldt decision also confirmed that the Quinault Nation's usual and accustomed fishing areas include Reservation waters, Grays Harbor, and the streams emptying into it, as well as the Pacific Ocean adjacent to its territory. *Id.* at 374-75.

28.     To the Quinault people, fish were, and remain, "not much less necessary to their existence than the atmosphere they breathe [ ]." *Id.* at 407. Fish are a source of social, economic, and cultural values. The Quinault people use fishing to educate younger generations in life lessons as a means to pass on traditional knowledge and the importance of stewardship of natural resources for future generations. Salmon have particular historical significance as a vital cultural and economic resource of the Quinault people. Salmon are communally served at all social and community events. Today, fish remains a primary food source for Quinault tribal members' diet.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

29.     Plaintiff **Los Angeles Waterkeeper (LA Waterkeeper)**, a California public benefit non-profit corporation, seeks to achieve ecosystem health and resiliency for the region's waters to ensure that the waters can support the communities and wildlife that depend on them. LA Waterkeeper works to undo the decades of damage that pollution, overfishing, overdevelopment, and habitat loss have wrought on the region's rivers, creeks, and coastal waters, as well as prevent new threats such as offshore finfish aquaculture. LA Waterkeeper seeks to restore Los Angeles' coastal and riparian habitats through research, fieldwork, community engagement, and broad-based coalition building, as well as through regulatory and legal advocacy and policy work. Additionally, LA Waterkeeper acts to ensure the protection and preservation of several Marine Protected Areas off Los Angeles County's coastline to safeguard and restore local habitats and aquatic species, track and report increased poaching of aquatic wildlife, and collect critical data that helps improve the management of these protected areas and otherwise fragile ecosystems.

30.     Plaintiff **San Diego Coastkeeper (SD Coastkeeper)** is a non-profit public benefit corporation that seeks to protect and restore fishable, swimmable, and drinkable waters in San Diego County. SD Coastkeeper takes a strategic, multifaceted approach of litigation and advocacy, science, education, and community engagement to carry out the international Waterkeeper Alliance's objectives to preserve, enhance, and protect the region's marine ecosystems, coastal estuaries, wetlands, and inland waterbodies. SD Coastkeeper believes that humans and the environment share a fundamental right to clean water and recognizes the inherent value of San Diego's inland and marine waters and the ecosystems and biodiversity they support. To further these goals, SD Coastkeeper actively seeks federal, state, and local agency implementation of numerous laws, regulations, and permits, and, where necessary, directly initiates litigation on behalf of itself and its members.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

31.     Plaintiff **Santa Barbara Channelkeeper** (SB Channelkeeper) is a non-profit organization with the mission of protecting and restoring the Santa Barbara Channel and its watersheds. For over twenty years, SB Channelkeeper has engaged as a lead stakeholder to protect environmental, public trust resources from a wide variety of industries, including offshore drilling, desalination, sewage spills, dredging, and other pollution sources. NMFS recently identified the Santa Barbara Channel as the primary location in Southern California to promote finfish aquaculture in federal waters. This proposal represents the most significant expansion of industrialization of the Santa Barbara Channel that has occurred over the last several decades.

32.     SB Channelkeeper's constituents include the people, businesses, and wildlife along the coast of the Santa Barbara Channel, which covers approximately 500 square miles from Gaviota to the Ventura River, as well as the 7 million tourists who visit each year to enjoy the beaches and coastal waters. This region's population is approximately 245,000 and incorporates the communities of Goleta, Santa Barbara, Carpinteria, Ojai, and other unincorporated portions of Santa Barbara and Ventura Counties.

33.     LA Waterkeeper, SD Coastkeeper, and SB Channelkeeper have all openly opposed offshore industrial finfish aquaculture projects in southern California. As far back as 2015, SD Coastkeeper opposed a 700-acre commercial fish farm off San Diego's coast, then-called Rose Canyon Fisheries, which proposed to raise commercially valuable yellowtail in the unregulated federal waters west of Mission Beach. SD Coastkeeper and other groups fiercely advocated against the proposed project, and its plans were quietly shelved in 2016. In September 2020, the project resurfaced under the same ownership but with a new name, Pacific Ocean AquaFarms. SD Coastkeeper and LA Waterkeeper advocated against this project before various local decision-making bodies, including the Port of San Diego, and

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

submitted scoping comments for the Pacific Ocean AquaFarms Environmental Impact Statement (EIS). More recently, all three groups joined in submitting comments to NMFS regarding the Notice of Intent to Prepare a Programmatic EIS for the Southern California Aquaculture Opportunity Area, discussed *infra*.

34. Plaintiff **Wild Fish Conservancy** is a membership-based 501(c)(3) nonprofit organization incorporated in the State of Washington with its principal place of business in Duvall, Washington. Wild Fish Conservancy is dedicated to the preservation and recovery of Washington's native fish species and the ecosystems upon which those species depend. As an environmental watchdog, Wild Fish Conservancy actively informs the public on matters affecting water quality, fish, and fish habitat in the State of Washington through publications, commentary to the press, and sponsorship of educational programs. Specifically, the Conservancy has been particularly active in efforts to educate the public and government officials throughout the Puget Sound region on the impacts of commercial aquaculture, specifically on the impacts of the Cooke Aquaculture net pen facilities in state waters in Puget Sound.

35. Wild Fish Conservancy also conducts field research on wild fish populations and has designed and implemented habitat restoration projects. Wild Fish Conservancy advocates and publicly comments on federal and state actions that affect the region's native fish and ecosystems. Wild Fish Conservancy routinely seeks to compel government agencies to follow the laws designed to protect native fish species, particularly threatened and endangered species. The Conservancy's members derive scientific, educational, recreational, health, conservation, spiritual, and aesthetic benefits from Puget Sound and its tributaries, the surrounding areas, and from wild native fish species in those waters and from the existence of natural, wild, and healthy ecosystems.

COMPLAINT – 15
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

36.     Plaintiff **Recirculating Farms Coalition** is a national nonprofit organization focused on sustainable food and farming with its headquarters in New Orleans, Louisiana. Recirculating Farms Coalition is a collaborative group of farmers, fishermen, educators, scientists, nonprofit organizations, and many others committed to advocating for and building local sources of healthy, accessible food. Through research, education, and advocacy, Recirculating Farms Coalition's members work together to support the development of eco-efficient, unique farms that use clean recycled water as the basis to grow food. These systems include recirculating hydroponics (growing plants in nutrient-rich recycled water), land-based aquaculture (raising fish in tanks on land that reuse and recycle water and waste), and aquaponics (a combination of recirculating hydroponics and recirculating aquaculture, where fish and plants are raised together in a single connected system). Through training, outreach, and advocacy, the organization advances sustainable farming and creates stable jobs in green businesses in diverse communities, to foster physical, mental, and financial wellness. Recirculating Farms Coalition has approximately 5,800 members, supporters, and activists in the Gulf states, and approximately 20,000 members, supporters, and activists nationwide.

37.     Recirculating Farms has repeatedly opposed offshore industrial finfish aquaculture projects nationwide, but particularly in the Gulf of Mexico. In 2016, Recirculating Farms served as co-counsel in *Gulf Fishermen's Association*, challenging NMFS's first ever offshore aquaculture permitting scheme in the Gulf of Mexico. 341 F. Supp. 3d at 634. After the Fifth Circuit vacated that permitting scheme, Recirculating Farms joined in challenging EPA's first National Pollutant Discharge Elimination System (NPDES) permit for Velella Epsilon, an offshore aquaculture facility in federal waters in the Gulf. And most recently, Recirculating Farms joined in submitting comments to NMFS regarding the Notice of Intent to

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Prepare a Programmatic EIS for the Gulf of Mexico Aquaculture Opportunity Area, as well as in southern California, discussed *infra*.

38.    Together, the Plaintiff organizations encompass a broad array of significant interests in ocean waters, particularly off the coast of Washington, southern California, and the Gulf of Mexico, for commercial, economic, recreational, cultural, and conservation purposes. A core part of each organization's mission includes protecting marine waters and fisheries from adverse impacts, including those that would occur from industrial aquaculture production in the Exclusive Economic Zone (EEZ). Several of the Plaintiff organizations economically depend on the marine waters and fisheries at stake for their very livelihoods. Other Plaintiffs focus on protecting the marine habitat and its wildlife, and/or ensuring that methods of fishing, if undertaken, are not done in a manner that harms the environment, public health, wild fisheries, and other wildlife.

39.    Specifically, numerous Plaintiff groups focus on protecting federal waters in the Aquaculture Opportunity Areas where prospective operators will like site the facilities, as designated in accordance with the same May 2020 Executive Order that mandated NWP 56, discussed *infra*. For example, Plaintiffs LA Waterkeeper, SB Channelkeeper, and SD Coastkeeper have members that live, work, and recreate in the Southern California Bight, where NMFS is currently working on a final programmatic EIS for its Aquaculture Opportunity Area designation. Plaintiffs Don't Cage Our Oceans, Recirculating Farms, and CFS, too, represent tens of thousands of members in the Gulf of Mexico region, also designed as an Aquaculture Opportunity Area, who support safe, sustainable food production.

40.    Plaintiffs' members include commercial and recreational fishermen and others engaged in fishing-related commercial activities in and around the districts that authorized NWP 56—activities that would be adversely affected by industrial aquaculture authorized by NWP 56. Specifically, Plaintiffs IFR and PCFFA have

1   members whose livelihoods rely on the Southern California Bight, which NMFS

2   designated for industrial aquaculture, discussed *infra*. PCFFA, for example, has

3   active member associations in the Ports of Santa Barbara and the Port of San Luis,

4   that actively fish in the waters NMFS slated for aquaculture development and which

5   fall in the Los Angeles District that adopted NWP 56. The productive and

6   sustainable ocean fisheries from which these members derive their livelihoods

7   entirely depend on the health and biological integrity of fragile ocean ecosystems

8   threatened by offshore aquaculture permitted by NWP 56. Adverse impacts such as

9   water pollution, the spread of sea lice, disease, and other fish parasites from farmed

10  fish to nearby migrating wild populations, fish escapes competing with wild fish for

11  limited food supplies and space, and escaped fish interbreeding with wild fish stocks

12  cumulatively impact the wild fish populations IFR and PCFFA members rely on over

13  time.

14      41.   Plaintiffs' members also include individuals who enjoy and rely on their

15  local ocean waters for commercial, recreational, and aesthetic purposes, including

16  boating, fishing, surfing, kayaking, paddleboarding, scuba diving, snorkeling,

17  swimming, wildlife photography, whale watching, and other wildlife observation.

18  Plaintiffs' members regularly engage in and enjoy observing and studying wildlife in

19  and around marine waters, including marine mammals, wild fish, migratory birds,

20  and other species likely to be harmed by offshore industrial aquaculture. Members

21  also lead educational and ecological tours including birdwatching and kayaking

22  tours, educating members of the public about various flora, fauna, and ecosystems,

23  as well as engage in scientific study through pollution and habitat monitoring,

24  including water quality sampling and assessment and other biological assessments.

25  Plaintiffs' members use and enjoy the areas that NWP 56 will directly harm as a

26  result of impacts to wildlife, and their exclusion from certain areas to be enclosed for

27  commercial aquaculture purposes.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

42.     More specifically, Plaintiffs' members enjoy recreating in areas NMFS slated for aquaculture development alongside NWP 56, as discussed *infra*. For example, members of LA Waterkeeper, SD Coastkeeper, and SB Channelkeeper enjoy boating, fishing, swimming, and wildlife observation in the Southern California Bight, an area NMFS designated for future industrial aquaculture development, in the Los Angeles District that adopted NWP 56. Similarly, numerous members of Don't Cage Our Oceans Coalition and Recirculating Farms Coalition enjoy recreational activities in the Gulf of Mexico, another area NMFS designated for aquaculture, for which local districts adopted NWP 56, and for which a prospective aquaculture operator has already submitted a preconstruction notice, discussed *infra*. And members in Washington, including the Quinault Indian Nation, have cultural ties to the waters connected to Oak Harbor, where a prospective aquaculture operator has submitted a preconstruction notice to the Seattle District. *See infra.*

43.     Plaintiff Quinault Indian Nation also has cultural and spiritual interests that industrial aquaculture threatens. Members of Quinault Indian Nation continue to rely on wild fish as a food source, and fish and fishing remain central to the preservation of the Quinault's cultural vitality and spirituality. As a result, Quinault tribal members face an elevated risk to their very survival if their fishing rights are jeopardized. Such a risk is posed if fish were to escape the confinement of aquaculture facilities located on the West Coast of Washington and inhabit the same waters as those fish sacred to the Quinault people. The ability of Quinault tribal members to fully connect to their history and culture through fishing and participating in ceremonies and other events would be undermined by the threats posed by aquaculture facilities within or near their usual and accustomed fishing areas.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

44.     In addition to Plaintiff Quinault Nation, many of Plaintiffs' members also enjoy eating wild fish managed sustainably under existing fisheries. The health of available fish on the market, both wild and farmed, would be harmed both directly and indirectly by aquaculture operations via negative environmental impacts on wild fish and reduced quality of farmed fish through diseases, and use of drugs and other chemicals. Plaintiffs' members who are fish consumers would also be harmed if farmed fish were sold on the market and supplanted wild fish or undermined their ability to identify, purchase, and enjoy sustainably managed wild fish from their local region.

45.     Plaintiffs are also injured through impairment of their fundamental missions to protect the environment and imperiled species, and diversion of resources from other critical tasks that would not have been necessary absent the Corps' action. Because no public notice or opportunity for public engagement is required when prospective permittees submit a preconstruction notice, Defendants' failure to comply with the ESA, NEPA, RHA, and MSA has caused, and will continue to cause, Plaintiffs to divert and expend resources and staff—which would have instead been expended on other organizational conservation priorities—to learn about the effects of NWP 56 on the environment and listed species, including through having to repeatedly make Freedom of Information Act requests, review documents obtained from such requests, monitor the application of NWP 56 to specific projects in other ways (such as by contacting individual Corps offices), and examine NWP 56 projects in an effort to ascertain the effects of NWP 56-authorized projects on specific waterways, habitats, and species in which Plaintiffs and their members have vital interests.

46.     Plaintiffs are non-profit conservation organizations with limited resources that can be dedicated to their core missions to protect the environment, imperiled species, and the habitats they rely on. Defendants' action impedes

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Plaintiffs' abilities to carry out their fundamental missions, and directly undercuts decades of successful work by Plaintiffs to enforce environmental laws that protect waterways and listed species. Defendants' actions have also stifled the flow of data on impacts to the environment from aquaculture facility construction that are vital to Plaintiffs' efforts to conserve and protect the environment. The Corps' failure to consult with the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (FWS) (collectively, the Services) on NWP 56 and to comply with its NEPA and MSA obligations is therefore harming, and will continue to harm Plaintiffs by interfering with Plaintiffs' core organizational missions and by requiring them to divert their limited resources and personnel away from other activities in an attempt to fill the gap left by the Corps. The Corps' unlawful issuance of NWP 56 also seriously impairs the Plaintiff organizations' core conservation missions because it authorizes major aquaculture projects that otherwise would be required to apply for individual permits, thereby triggering the Corps' affirmative duty to publicly disclose information regarding such projects and their adverse impacts. The Corps' violations mean that instead of receiving such information in the ordinary course of individual permit processing and having an opportunity for public comment on individual permit applications, Plaintiffs must instead attempt to learn through other means precisely when and where NWP 56 is even being invoked, with no assurance of ever being able to uncover such information in a timely and effective manner. This constitutes a serious organizational and informational injury that flows directly from the Corps' unlawful issuance of NWP 56.

47.    If the Court declares NWP 56 unlawful, and vacates the permit, the Corps would no longer be able to rely on the permit to authorize industrial finfish operations that directly impair Plaintiffs' and their members' interests in marine ecosystems, wildlife, and surrounding communities. Moreover, the Court could

further prevent and reduce injuries to Plaintiffs and their members by ordering the Corps to fully consider the potential impacts before re-issuing NWP 56, as required by federal statutes and the agency's own regulations.

48.     Defendant **United States Army Corps of Engineers** is an agency of the U.S. Department of Defense. The Corps has a District Office in Seattle, Washington. The Corps and its officers are responsible for the lawful execution of the RHA, NEPA, and the APA, as they pertain to RHA Section 10 permits.

49.     Defendant **Lieutenant General Scott A. Spellmon** is the Commanding General and Chief of Engineers of the Corps. Lieutenant General Spellmon is named as a defendant solely in his official capacity. The Commanding General and Chief of Engineers is charged with supervising and managing all Corps' decisions and actions, including the evaluation of Corps' decisions and actions under NEPA and the RHA Section 10. The Chief of Engineers is authorized to issue NWPs and is charged with reviewing NWPs and proposing modifications, revocations, and reissuances, as well as preparing NEPA documents.

## LEGAL BACKGROUND

### I.     RIVERS AND HARBORS ACT

50.     The Rivers and Harbors Act Section 10, 33 U.S.C. § 403, renders unlawful "the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States … except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id.*

51.     The Corps' regulations further specify that "[t]he construction of any structure in or over any navigable water of the United States … is unlawful unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id.* § 320.2(b).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

52.     The Corps' regulations broadly define a "structure" as "any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction." *Id.* § 322.2(b).

53.     Section 4(f) of the OCSLA grants the Corps authority to permit structures on the Outer Continental Shelf under the RHA for activities specified in the OSCLA. *See Id.;* 43 U.S.C. § 1333(e).

54.     The Corps may issue either an individual permit or a general permit under RHA Section 10. Individual permits require the Corps to review individual applications, while general permits authorize a category or categories of activities in specific geographical regions or nationwide. 33 C.F.R. § 320.1(c). The Corps issues nationwide permits for "certain activities having minimal impacts," in order to streamline review and "to regulate with little, if any, delay or paperwork." *Id.* § 330.1(b).

55.     The RHA does not specifically allow for nationwide permits; rather, the Corps administratively created the nationwide permit program under both the RHA and the CWA in 1977. *See* Regulatory Programs of the Corps of Engineers, 42 Fed. Reg. 37,122, 37,126, 37,130-32 (July 19, 1977). Although the Corps combined the CWA and the RHA nationwide permit regulations into Part 330 in 1982, terms defined in the CWA apply only to CWA Section 404 permits, while applicable terms defined in the RHA apply to Section 10 nationwide permits. *See* Interim Final Rule for Regulatory Programs of the Corps of Engineers, 47 Fed. Reg. 31,794, 31,798-31,800 (July 22, 1982); *United States v. Cumberland Farms of Connecticut, Inc.,* 647 F. Supp. 1166, 1179 (D. Mass. 1986).

56.     For RHA purposes, regulations define a general permit as

"authorization that is issued on a nationwide or regional basis for a

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

category or categories of activities when: (1) Those activities are substantially similar in nature and cause only minimal individual and cumulative environmental impacts; or (2) The general permit would result in avoiding unnecessary duplication of the regulatory control exercised by another Federal, state, or local agency provided it has been determined that the environmental consequences of the action are individually and cumulatively minimal."

33 C.F.R. § 322.2(f). Thus, the Corps may issue nationwide permits under RHA Section 10 only when the permitted activities are (1) substantially similar in nature or to avoid unnecessary duplication *and* (2) cause only minimal individual and cumulative environmental impacts. *Id.*

57.     When issuing a nationwide permit, the Corps must base its decision on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity *and its intended use* on the public interest." *Id.* § 320.4(a)(1) (emphasis added).

58.     Public interest review requires the Corps to balance a projects' benefits against its reasonably foreseeable detriments. Specific factors the Corps must consider include cumulative effects on conservation, economics, aesthetics, general environmental concerns, fish and wildlife values, navigation, recreation, water quality, safety, food production, considerations of property ownership, and public welfare. *Id.*

59.     The Corps may opt to issue individual permits if it determines that impacts will result in more than minimal individual and cumulative impacts. 33 C.F.R. § 330.1(c). Activities covered under nationwide permits do not require individual permits; rather, permittees need only comply with the conditions contained in the general permit. *Id.* § 330.6(a).

60.     The Corps' regulations grant each district discretionary authority to modify, suspend, or revoke nationwide permit authorizations. *Id.* § 330.4(e). Modification may include adding additional or revised terms or conditions on the authorization when the district has concerns for the aquatic environment under any

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

public interest factor. *See id.* § 330.1(d). However, the "national decision document [must] actually evaluate [ ] the impacts of the proposed activity in light of any regional conditions imposed"; it cannot solely rely on future regional conditions. *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, 417 F. Supp. 3d 1354, 1366 (W.D. Wash. 2019).

61.     District engineers have the authority to determine if an activity complies with the terms and conditions of a nationwide permit, and any district-specific conditions. 33 C.F.R. § 330.4(e)(1-4). As specified in the general permit, permittees may need to provide preconstruction notification to the district before initiating construction. *See id.* §§ 320.1(c), 330.1(e).

62.     Corps regulations specify that nationwide permits do not obviate the need to obtain other federal, state, or local permits, approvals, or authorizations required by law and do not grant any property rights or exclusive privileges. *Id.* § 330.4(b)(2), (3). Nor do nationwide permits "authorize any injury to the property or rights of others." *Id.* § 330.4(b)(4).

63.     Corps regulations also make plain that nationwide permits may not authorize any activity "likely to jeopardize the continued existence of a threatened or endangered species as listed or proposed for listing under the [ESA], or to destroy or adversely modify the critical habitat of such species." *Id.* § 330.4(f).

## II.     OUTER CONTINENTAL SHELF LANDS ACT

64.     Congress passed the OCSLA in 1953 to assert federal jurisdiction over the Outer Continental Shelf and to establish a regulatory framework for the extraction of minerals therefrom. *See* 43 U.S.C. § 1332; *see also Ten Taxpayer Citizens Grp. v. Cape Wind Assocs.*, 373 F.3d 183, 188 (1st Cir. 2004) ("A major purpose of the OCSLA was to specify that federal law governs on the [OCS]." (internal quotation marks omitted)).

COMPLAINT – 25
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

65.     Congress enacted the OCSLA for two overarching purposes: (1) "[t]o provide for the jurisdiction of the United States over" Outer Continental Shelf lands and (2) "to authorize the Secretary of the Interior to lease such lands for certain purposes." Pub. L. No. 83-212, 67 Stat. 462, 462 (1953).

66.     Congress plainly sought more leasing but did not seek *unbridled* leasing. Congress also stated that the Act should "be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected." 43 U.S.C. § 1332(2).

67.     Accordingly, the OCSLA extended the Corps' RHA Section 10 regulatory authority "to prevent obstruction to navigation in the navigable waters of the United States ... to artificial islands and fixed structures located on the [OCS]." *Id.* § 1333(f) (1953). In 1978, Congress amended this grant of authority to apply instead to "the artificial islands, installations, and other devices referred to in subsection (a) of this section." *Id.* § 1333(e). Subsection (a), in turn, extends federal jurisdiction to "all artificial islands ... [and all] installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources ..., or any such installation or other device (other than a ship or vessel) for the purpose of transporting ... such resources." *Id.* at § 1333(a)(1).

68.     As originally enacted, the OCSLA authorized the Secretary of the Interior to issue leases for the extraction of oil, gas, and mineral resources from the Outer Continental Shelf. *See id.* § 1337. However, Congress amended the OCSLA in 2005 to add an authorization for the Secretary of the Interior to issue leases, easements, and rights-of-way for specified "activities not otherwise authorized [by OCSLA], ... the Ocean Thermal Energy Conversion Act of 1980, or other applicable law." *Id.* § 1337(p)(1). These specified activities include those that: (1) support the development, extraction, and transportation of oil or natural gas; (2) support the

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

development and production of energy from sources other than oil and gas; and (3) "use, for energy-related purposes or for other authorized marine-related purposes, facilities currently or previously used for activities authorized under" the OCSLA. *Id.* §§ 1337 (p)(1)(A-D). Congress thus specifically amended the OCSLA to authorize the issuance of leases, easements, and rights-of-way for offshore renewable energy projects. *Id.*

## III.   THE PROPERTY CLAUSE

69.     The Property Clause of the Constitution places with Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2.

70.     The Supreme Court has recognized that "[t]he power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation.'" *Alabama v. Texas*, 347 U.S. 272, 273 (1954) (*per curiam*) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)).

71.     The OCSLA has, since its enactment, established that lands on the Outer Continental Shelf are subject to federal "jurisdiction, control, and power of disposition as provided in" the OCSLA. Pub. L. No. 83-212, § 3(a), 67 Stat. 462, 462 (1953) (current version at 43 U.S.C. § 1332). Although the President has the constitutional authority under Article II to provide for national security and conduct foreign affairs, the President's authority to dispose of lands on the Outer Continental Shelf can arise only by delegation from Congress.

## IV.   NATIONAL ENVIRONMENTAL POLICY ACT

72.     Pursuant to 42 U.S.C. §§ 4321–4370m, NEPA is our basic national charter for protection of the environment. Regulations promulgated by the Council on Environmental Quality (CEQ) establish that NEPA's twin aims are to (1) ensure

COMPLAINT – 27
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

fully informed decision-making, and (2) provide for public participation in environmental analysis and decision-making. 40 C.F.R. § 1500.1(a).

73.     As provided by law, the Corps has adopted regulations to implement NEPA. *See* 33 C.F.R. § 230. The Corps' NEPA regulations supplement—and do not supersede—other NEPA regulations. *Id.*

74.     NEPA and its implementing regulations require federal agencies like the Corps to prepare an EIS regarding all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Agencies must prepare an EIS before they commit "resources prejudicing selection of alternatives." 40 C.F.R. § 1502.2(f).

75.     "Action" broadly includes "[a]doption of official policy, such as rules, regulations, and interpretations." *Id.* § 1508.1(q)(3)(i). "Major federal action[s]" under NEPA include "activit[ies] or decision[s] subject to Federal control and responsibility." *Id.* § 1508.1(q). "If any 'significant' environmental impacts might result then an EIS must be prepared before the action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

76.     NEPA prohibits an agency from avoiding significance, and thus from performing an environmental assessment, by dividing a proposed program into component parts. 40 C.F.R. § 1502.4(a). Rather, a federal agency should prepare a programmatic EIS for the adoption of new agency programs. *Id.* § 1502.4(b). CEQ regulations even include in the definition of major federal action "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." *Id.* § 1508.1(q)(3)(iii). A programmatic EIS ensures that an agency's NEPA review is "relevant to the program decision and timed to coincide with meaningful points in agency planning and decision making" and "should be available before the program has reached a

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives." *Id.* § 1502.4(b).

77.     An EIS, including a programmatic EIS, must disclose all the consequences of the proposed action, including the direct, indirect, and cumulative effects. *Id.* § 1508.1(g).

78.     NEPA's implementing regulations define cumulative impacts as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions" and can result from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.1(g)(3). In considering cumulative impacts, "an agency must provide 'some quantified or detailed information; … general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definite information could not be provided." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379-80 (9th Cir. 1998)).

79.     An agency may justify a FONSI with mitigation measures; however, measures "must be developed to a reasonable degree," and a "perfunctory description, or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001) (citations omitted).

80.     NEPA requires that agencies and the public have access to high-quality environmental information before making decisions or taking action. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

81.     NEPA requires that an agency incorporate its environmental analysis into its decision-making process. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

## V.     ENDANGERED SPECIES ACT

82.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress's "plain intent ... in enacting [the ESA] was to halt and reverse the trend towards species extinction, whatever the cost." *Id.* at 184. The ESA's "language, history, and structure" make plain that "Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174; *see also* 16 U.S.C. § 1536(a); *id.* § 1531(c)(1) ("[A]ll Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authority in furtherance of the purposes of this [Act].").

83.     The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior. The Secretaries in turn delegated this responsibility to the Services. The NMFS serves as the expert consulting agency for most anadromous and marine species, and the FWS for many terrestrial and freshwater species.

84.     To fulfill the ESA's purpose, "[e]ach Federal agency shall, in consultation with and with the assistance of the [Services], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a). In fulfilling this requirement, the agencies "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

85.     The scope of agency actions subject to consultation broadly includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (definition of "action"). Programmatic consultation "is a consultation addressing an agency's multiple actions on a program region, or other basis." 50 C.F.R. § 402.02 (definition of "programmatic consultation"); *see also* 80 Fed. Reg. 26,832, 26,836 (May 11, 2015) (programmatic consultation "allows for a broad-scale examination" of federal programs that is "not as readily conducted" through subsequent project-specific consultation). Individual consultations at a later stage do not obviate the need for programmatic consultation on a program under the ESA. *See* 84 Fed. Reg. at 44,997 (stating the ESA "still requires a programmatic consultation to meet the requirements of section 7(a)(2)[,]" even if "specific projects … developed in the future … are subject to site-specific stepped-down, or tiered consultations where incidental take is addressed"); *see also* 80 Fed. Reg. at 26,835 ("[A] second consultation and an action-specific incidental take statement still need to be provided when later actions are authorized under the program."); 80 Fed. Reg. at 26,836 (programmatic consultations enable the Services "to determine whether a program and its set of measures intended to minimize impacts or conserve listed species are adequately protective").

86.     The ESA prohibits federal agencies from making "any irreversible or irretrievable commitment of resources" that would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures" through the consultation process. 16 U.S.C. § 1536(d). Agencies must review their actions "at the earliest possible time." 50 C.F.R. § 402.14(a).

87.     The ESA establishes an interagency consultation process to assist federal agencies in complying with their substantive duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

88.     Section 7(a)(2) requires federal agencies to initiate consultation with the Services whenever an action "may affect" ESA-listed species or designated critical habitat. "Effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action," and include those that "may occur later in time and may include consequences occurring outside the immediate area involved in the action." 50 C.F.R. § 402.02 (definition of "effects of the action"); *see also* 50 C.F.R. § 402.17.

89.     For each federal action, the action agency must ask the Services whether any listed or proposed species may be present in the area of the agency action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. *Id.* The biological assessment must generally be completed within 180 days. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

90.     If the action agency (here, the Corps) determines that an action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, the regulations permit "informal consultation," during which the wildlife agencies must concur in writing with the action agency's determination. 50 C.F.R. § 402.13; 402.14(a)-(b). If the action agency determines that its action is "likely to adversely affect" a listed species or critical habitat, or if the Services do not concur with the action agency's "not likely to adversely affect" determination, the action agency must engage in "formal consultation," as outlined in 50 C.F.R. § 402.14.

91.     An action agency is relieved of the obligation to consult on its actions under the ESA only where the action will have "no effect" on listed species or designated critical habitat.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

92.    The end product of formal consultation is a biological opinion in which the Services determine whether the agency action will jeopardize the survival and recovery of listed species or will destroy or adversely modify the species' designated critical habitat. 16 U.S.C § 1536(b). To make this determination, the Services must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of federal and nonfederal activities in the area, on listed species. 16 U.S.C § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h). The Services have a duty to use the best scientific and commercial data available in the ESA consultation process and in formulating the biological opinion. 16 U.S.C § 1536(a)(2); 50 C.F.R. §402.14(g)(8).

93.    If either of the Services conclude that the proposed action will jeopardize the continued existence of a listed species, the biological opinion must outline "reasonable and prudent alternatives" that will avoid jeopardy. 16 U.S.C § 1536(b)(3)(A); 50 C.F.R. §402.14(h)(2). "[R]easonable and prudent alternatives" are alternative actions identified during formal consultation that: (1) can be implemented in a manner consistent with the intended purpose of the action, (2) can be implemented consistent with the scope of the action agency's legal authority, (3) are economically and technologically feasible, and (4) that the Services believe would avoid the likelihood of jeopardizing the continued existence of listed species and/or avert the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.02 (definition of "reasonable and prudent alternatives").

94.    Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person to "take" any endangered species of fish or wildlife listed under the ESA. "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19).

95.    In formal consultation, the Services determine whether to authorize the take of listed species through the issuance of an incidental take statement, which

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

may only be issued if the action can proceed without causing jeopardy. 16 U.S.C. § 1536(b)(4). An incidental take statement must: (1) specify the impact of the incidental take on the listed species, (2) specify "reasonable and prudent measures" the agency considers necessary to minimize that impact, and (3) set forth mandatory terms and conditions. *Id.*

96.    An incidental take statement insulates an action agency from liability for take of an endangered or threatened species, provided the agency complies with the statement's terms and conditions. 16 U.S.C. § 1536(o)(2). This insulation from liability extends to any entity receiving a federal permit, license, authorization, or funding that is subject to, and in compliance with, the incidental take statement. *Id.*

97.    Incidental take statements cannot be provided at the programmatic level, when consultation is done for certain programmatic actions, but rather may be issued during subsequent project-specific consultation. 50 C.F.R. § 402.14(i)(6). However, a later project-specific consultation "does not relieve the Federal agency of the requirements for considering the effects of the action as a whole." *Id.* § 402.14(c)(4).

## VI.    MAGNUSON-STEVENS ACT

98.    The MSA provides the nation's longstanding program aimed at the management and conservation of ocean fish and fishing resources. 16 U.S.C. § 1801(a); *id.* § 1801(b)(1). In order to address threats to wild fisheries and the coastal communities that rely on them, Congress passed the MSA in 1976 to "prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(6); *id.* § 1801(a)(1)-(3).

99.    The MSA aims to "conserve and manage the fishery resources found off the coasts of the United States." *Id.* § 1801(b)(1).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

100.   The Act provides that "[e]ach Federal agency shall consult with the Secretary [of Commerce] with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter." *Id.* § 1855(b)(2); *Id.* § 1802(39). "The term 'essential fish habitat' means those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." *Id.* § 1802(10).

101.   To "adversely affect" means *any* impact that reduces the quality and/or quantity of EFH, and may include direct (e.g., contamination or physical disruption), indirect (e.g., loss of prey or reduction in species fecundity), site-specific, or habitat-wide impacts, including individual, cumulative, or synergistic consequences of actions. 50 C.F.R. § 600.810.

102.   When an agency consults with NMFS on impacts to EFH under the MSA, it must "recommend to such agency measures that can be taken by such agency to conserve such habitat," and should the action agency fail to adopt those measures it must explain its reasons for not following those measures. 16 U.S.C. § 1855(4).

103.   Action agencies initiate consultation by preparing an EFH assessment which must contain "(i) A description of the action. (ii) An analysis of the potential adverse effects of the action on EFH and the managed species. (iii) The Federal agency's conclusions regarding the effects of the action on EFH. (iv) Proposed mitigation, if applicable." 50 C.F.R. § 600.920(e)(3). An action agency can limit its EFH assessment to these minimum requirements and thus engage in what are known as the "abbreviated consultation procedures" with NMFS, but only if its action does not have the potential to cause a substantial adverse effect on EFH. *Id.* § 600.920(h).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

104.    However, if the action does have the potential to adversely impact EFH, the action agency must engage in "expanded consultation procedures" with NMFS, intended to "allow[ ] maximum opportunity for NMFS and the [action] agency to work together to review the action's impacts on EFH and to develop EFH Conservation Recommendations." *Id.* § 600.920(i). These procedures involve (i) an on-site inspection to evaluate the habitat and the site-specific effects of the project; (ii) the views of recognized experts on the habitat or species that may be affected; (iii) a review of pertinent literature and related information; (iv) an analysis of alternatives to the action, including alternatives that could avoid or minimize adverse effects on EFH; and (v) analysis of other relevant information. *See id.* § 600.920(e)(4).

105.    If the action agency believes that its action will not result in substantial adverse impacts to EFH it may submit an EFH assessment meeting the minimal requirements discussed above. *Id.* § 600.920(h)(2). However, if NMFS determines that, in fact, "the action may result in substantial adverse effects on EFH, or that additional analysis is needed to assess the effects of the action," NMFS must request that the action agency engage in expanded consultation. *Id.* § 600.920(h)(3).

## VII.   ADMINISTRATIVE PROCEDURE ACT

106.    The APA authorizes any person who has been adversely affected by an agency action to seek judicial review of the action. 5 U.S.C. § 702. The APA provides a cause of action to challenge agency actions "made reviewable by statute," or final actions "for which there is no other adequate remedy in a court." *Id.* § 704. In addition, the APA provides standards for judicial review of agency action. The APA also directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

1    107.    Agency actions are arbitrary and capricious "if the agency has relied on

2  factors which Congress has not intended it to consider, entirely failed to consider an

3  important aspect of the problem, offered an explanation for its decision that runs

4  counter to the evidence before the agency, or is so implausible that it could not be

5  ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

6  *Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

7  (1983).

8    108.    The APA provides a cause of action for challenging the Corps' actions

9  under NEPA, the RHA, the OCSLA, and the MSA because "there is no other

10  adequate remedy in a court" with respect to these actions. As a result, Plaintiffs'

11  claims arising under NEPA, the OCSLA, the RHA, and the MSA are reviewable

12  under the APA.

13    109.    The ESA does not contain an internal standard of review, so judicial

14  review of claims brought under the ESA are governed by the APA. Under the APA,

15  courts "shall hold unlawful and set aside" agency action, findings, or conclusions

16  under the ESA found to be "arbitrary, capricious, and abuse of discretion, or

17  otherwise not in accordance with law" or "without observance of procedure required

18  by law." 5 U.S.C. § 706(2)(A), (D).

## FACTUAL BACKGROUND

## I.    INDUSTRIAL FINFISH AQUACULTURE

110.    Industrial aquaculture results in a plethora of well-known, documented

adverse environmental and intertwined socioeconomic consequences. These adverse

impacts include but are not limited to: farmed fish escaping; pathogen and parasite

spread from aquaculture facilities to wild fish and marine wildlife; water pollution

from aquaculture inputs (e.g., drugs, pesticides, fungicides, algaecides) and outputs

(fish feed and wastes); ocean resource privatization; threats to marine life and

marine ecosystems from aquaculture systems; and market displacement and price competition from cheaply produced farmed fish.

A.    Environmental and Public Health Impacts

111.    Catastrophic environmental consequences from offshore aquaculture abroad as well as in state waters provide insight as to the likely impacts on U.S. federal waters. Rather than replacing wild fish consumption, farmed fish production in other regions has instead exacerbated the diminishing populations of wild fish. The industry's ever-growing demand for feed jeopardizes the survival of wild stocks and disrupts the balance of marine ecosystems. Wild fish removal to produce fish feed reduces the natural supply of food for farmed fish's wild counterparts, as well as seabirds and other marine life. Even ten years ago, the Food and Agriculture Organization of the United Nations considered most reduction fisheries, which use their catch to produce fishmeal or fish oil rather than for direct human consumption, already fully exploited and some overexploited, meaning they were already producing catches at or near the maximum sustainable level, and they risked stock depletion if catches were not reduced.

112.    Regarding water quality, the excess fish feed, dead fish, and fish feces that facilities directly discharge into surrounding waters also harm the surrounding environment. Nutrient pollution decreases oxygen levels in our waters, killing off aquatic life and creating low-oxygen "dead zones" and harmful algal blooms.[2] These harmful algal blooms produce toxic chemicals that can kill fish and other vertebrates by affecting their central nervous systems, and can cause serious illness in humans with severe or chronic respiratory conditions.[3] The Environmental Protection Agency

---

[2] DONALD BOESCH ET AL., PEW OCEANS COMM'N, MARINE POLLUTION IN THE UNITED STATES 20-22 (2001), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/protecting_ocean_life/envpewoceanspollutionpdf.pdf.

[3] NOAA, *Harmful Algal Blooms*, https://oceanservice.noaa.gov/hazards/hab/.

(EPA) admits that aquaculture contributes to algal blooms and costal

eutrophication.[4] Despite the industrial aquaculture industry's assertion that deeper

waters will dilute pollution from offshore aquaculture, existing studies show that

"dilution is not the solution to pollution"—it all goes somewhere and has effects.

Accumulation of pollutants continues to occur and can affect even a larger area due

to the unpredictability of ocean currents.

113.    Housing large populations of finfish in net pens also inevitably breeds

pests and disease, which can spread pathogens and parasites to wild fish and other

wildlife. Recent research indicates that the probability of detecting pathogen

environmental DNA is 2.72 times higher at active versus inactive salmon farm

sites.[5] And in 2012, off the coast of Bainbridge Island, a massive viral outbreak in

Atlantic salmon net pens led to the deaths of over one million pounds of farmed

Atlantic salmon.[6]

114.    Consequently, industrial aquaculture operators will likely use

antibiotics and other pharmaceuticals to control disease spread. For example, EPA

authorized the first offshore aquaculture facility approved in U.S. federal waters,

---

[4] GOLDBURG, ET AL., PEW OCEANS COMM'N, MARINE AQUACULTURE IN THE
UNITED STATES: ENVIRONMENTAL IMPACTS AND POLICY OPTIONS 12-13 (2001),
https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-
public/marine_aquaculture_pew_2001.pdf.

[5] L.N. FRAZER, ET AL., Environmental DNA (eDNA) from multiple pathogens is
elevated near active Atlantic salmon farms, ROYAL SOC'Y PUBL'G, Oct. 2020), at 3,
http://dx.doi.org/10.1098/rspb.2020.2010.

[6] New Federal Analysis Finds Puget Sound Commercial Net Pens Are
Harming Salmon, Steelhead, And Other Protected Fish, WILD FISH CONSERVANCY
N.W. (June 29, 2022), https://wildfishconservancy.org/new-federal-analysis-finds-
puget-sound-commercial-net-pens-are-harming-salmon-steelhead-and-other-
protected-
fish/#:~:text=New%20Federal%20Analysis%20Finds%20Puget%20Sound%20Comme
rcial%20Net,protected%20fish%2C%20as%20well%20as%20their%20critical%20habi
tats.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Velella Epsilon, to use any amount of veterinary therapeutic products, antibiotics, other treatment, and medicinal premixes for inclusion in fish feeds which are approved for use in aquaculture by the Food and Drug Administration.[7] This use will not only leave residues in seafood, but will leach into the ocean, contaminating nearby waters and marine life. For example, the salmon aquaculture industry widely uses Emamectin benzoate to treat sea lice, which could result in drug resistance.[8] In Nova Scotia, the use of this antibiotic resulted in widespread damage to wildlife, including "substantial, wide-scale reductions" in crabs, lobsters, and other crustaceans close to marine finfish facilities.[9] In fact, the surrounding environment directly absorbs up to 75% of antibiotics used in industrial aquaculture.[10]

115.   Antibiotic use also raises significant human health concerns. The antibiotics and other chemicals that are used in fish farming to prevent disease and parasites can accumulate in fish and contribute to antibiotic resistance. Indeed, studies have concluded that reliance on antibiotic applications in fish farming has fostered the development of antibiotic resistance in our waters.[11]

---

[7] U.S. EPA, NPDES PERMIT NO. FL0A00001 - OCEAN ERA, INC., at 5-6 (2022), https://www.epa.gov/sites/default/files/2020-10/documents/npdes_permit_for_ocean_era_inc._-_velella_epsilon_fl0a00001.pdf.

[8] CHUN TING LAM, ET. AL, NATURERESEARCH, SEA LICE EXPOSURE TO NON-LETHAL LEVELS OF EMAMECTIN BENZOATE AFTER TREATMENTS: A POTENTIAL RISK FACTOR FOR DRUG RESISTANCE 1 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6976678/pdf/41598_2020_Article_57594.pdf.

[9] Rob Edwards, THE HERALD, *Scottish government accused of colluding with drug giant over pesticides scandal* (June 3, 2017), http://www.heraldscotland.com/news/15326945.Scottish_government_accused_of_colluding_with_drug_giant_over_pesticides_scandal/.

[10] UNITED NATIONS, FRONTIERS 2017: EMERGING ISSUES OF ENVIRONMENTAL CONCERN 15 (2017), https://www.unep.org/resources/frontiers-2017-emerging-issues-environmental-concern.

[11] *Id.* at 14-15.

COMPLAINT – 40
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

116.    And the fish feed industry, which exists to feed these farmed fish, has numerous harmful impacts of its own. Raising carnivorous fish species requires a diet high in fishmeal and/or fish oil that is derived from wild-caught fish stocks such as mackerel, herring, menhaden, and anchovies. Depending on the species, many more wild forage fish are often needed to grow farmed fish.[12] For example, growing one pound of bluefin tuna requires fifteen pounds of forage fish.[13] Currently, more than 30 percent of all marine life pulled from the sea feeds other fish in aquaculture farms inland.[14] As such, industrial aquaculture has actually exacerbated the diminishing overall populations of wild fish by depleting forage fish stocks.

117.    Offshore aquaculture facilities also remain vulnerable to extreme weather events, which frequently result in fish escapes. In January 2020, for example, 73,600 salmon escaped from a net pen during a storm in Mowi, Scotland, marking the third major escape in the area since November 2018.[15] From facilities in Norway, a series of storms resulted in approximately four million escaped fish over an eight year period.[16] Even without extreme weather, in August 2017, an industrial

---

[12] *See generally* Björn Kok, et al., *Fish as feed: Using economic allocation to quantify the Fish In : Fish Out ratio of major fed aquaculture species*, AQUACULTURE (Nov. 2020), https://www.sciencedirect.com/science/article/pii/S0044848620309741?via%3Dihub.

[13] PACIFIC BLUEFIN TUNA, MONTEREY BAY AQUARIUM 36-37 (2016), https://seafood.ocean.org/wp-content/uploads/2016/12/Tuna-Bluefin-Japan-Farmed.pdf#:~:text=Pacific%20bluefin%20tuna%20%28Thunnus%20orientalis%29%20farming%20in%20Japan,placed%20on%20tuna%20farming%20and%20hatchery-based%20stock%20enhancement.

[14] *The Outlaw Ocean Podcast: Episode 5: Waves of Extraction,* L.A. Times & CBC (Oct. 24, 2022), https://www.theoutlawocean.com/the-outlaw-ocean-podcast/.

[15] *Escape calls high energy salmon sites into question*, THE FISH SITE (Jan. 20, 2020), https://thefishsite.com/articles/mowi-reports-mass-salmon-escape-from-colonsay.

[16] NAT'L MARINE FISHERIES SERV. PAC. ISLANDS REG'L OFF., DRAFT PROGRAMMATIC ENV'T IMPACT STATEMENT 171 (2021),

COMPLAINT – 41
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

net pen operation maintained by Cooke Aquaculture Pacific, LLC allowed for approximately 260,000 farmed Atlantic salmon to escape into the Puget Sound and the Pacific.[17] Recognizing the regularity of fish escapes from ocean-based net pens, the Council on Environmental Quality has stated that it "must be *assumed* that escapes will occur" from net pens, even in the absence of severe weather.[18]

118.    These fish escapes impact local stocks in a variety of ways, including predation, competition for food, habitat, and spawning areas, and interbreeding with wild populations of the same fish.[19] For example, Atlantic salmon that have escaped from aquaculture operations in Washington State and British Columbia compete with wild Pacific stocks, and increasing numbers of Atlantic salmon have been observed returning to rivers on the West Coast.[20] In the Atlantic region, the FWS has determined that "Atlantic salmon that escape from farms and hatcheries pose a threat to native Atlantic salmon populations."[21] They also predict that "escapement and resultant interactions with native stocks are expected to increase given the continued operation of farms and growth of the industry under current practices."[22]

---

https://www.regulations.gov/document/NOAA-NMFS-2021-0044-0003 [hereinafter DPEIS].

[17] E. Tammy Kim, *Washington State's Great Salmon Spill and the Environmental Perils of Fish Farming*, THE NEW YORKER (Sept. 13, 2017), https://www.newyorker.com/tech/elements/washington-states-great-salmon-spill-and-the-environmentalperils-of-fish-farming.

[18] CASE STUDY NO. 1: GROWTH-ENHANCED SALMON, COUNCIL FOR ENV'T QUALITY & OFFICE OF SCI. &TECH. POLICY 23 (2001), https://clintonwhitehouse5.archives.gov/media/pdf/salmon.pdf (emphasis added).

[19] DPEIS *supra* n.16, at 158.

[20] GOLDBURG, ET AL, *supra* n.4, at 6-7.

[21] Endangered and Threatened Species; Proposed Endangered Status for a Distinct Population Segment of Anadromous Atlantic Salmon (Salmo salar) in the Gulf of Maine, 64 Fed. Reg. 62627, 62635 (Nov. 17, 1999).

[22] *Id.*

COMPLAINT – 42
Case No. 22-1627

119.    Furthermore, reliance on the sterility of farmed fish to prevent interbreeding is never 100% guaranteed; therefore, the "long-term consequences of continued farmed [fish] escapes and subsequent interbreeding … include a loss of genetic diversity."[23] Studies also show that when farmed and wild fish interbreed their offspring have diminished survival skills, reduced fitness, and potentially altered life history characteristics such as altered timing of development events.[24] Researchers in Ireland, for example, have found that the interactions of farm escapees and wild salmon reduced the overall fitness of wild species and could lead to the extinction of wild populations.[25]

120.    Even when aquaculture operations produce native species, sourced from the wild, escape poses a threat to wild stocks.[26] "The longer a broodstock line is

[23] FISHERIES AND OCEANS CANADA, NEWFOUNDLAND AND LABRADOR REGION, STOCK ASSESSMENT OF NEWFOUNDLAND AND LABRADOR ATLANTIC SALMON 2 (2016), http://waves-vagues.dfo-mpo.gc.ca/Library/40619655.pdf ("Genetic analysis of juvenile Atlantic Salmon from southern Newfoundland revealed that hybridization between wild and farmed salmon was extensive throughout Fortune Bay and Bay d'Espoir (17 of 18 locations), with one-third of all juvenile salmon sampled being of hybrid ancestry."); *see also* Mark Quinn, CBC NEWS, *DFO study confirms 'widespread' mating of farmed, wild salmon in N.L.* (Sept. 21, 2016), https://www.cbc.ca/news/canada/newfoundland-labrador/farmed-salmon-mating-with-wild-in-nl-dfo-study-1.3770864.

[24] This occurs because farmed fish selected for aquaculture are bred to thrive in controlled, rather than wild, environments. *See* CONGRESSIONAL RESEARCH SERVICE, OPEN OCEAN AQUACULTURE 9-11 (2010), https://crsreports.congress.gov/product/pdf/RL/RL32694/19; *see also* Stephen Castle, *As wild salmon decline, Norway pressures fish farms* (Nov. 7, 2017), https://www.adn.com/nation-world/2017/11/07/as-wild-salmon-decline-norway-pressures-fish-farms/.

[25] Philip Mcginnity, et al., *Fitness reduction and potential extinction of wild populations of Atlantic salmon, Salmo salar, as a result of interactions with escaped farm salmon* (Dec. 2003), https://www.researchgate.net/publication/8967290_Fitness_reduction_and_potential_extinction_of_wild_populations_of_Atlantic_salmon_Salmo_salar_as_a_result_of_interactions_with_escaped_farm_salmon.

[26] DPEIS, *supra* n.16, at 171.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

developed (i.e., bred to improve growth, quality, and disease resistance, etc.) the greater the chance that their genes [may] begin to drift from their wild counterparts."[27]

121.    And recapturing escaped fish comes with its own adverse impacts. In February 2022, NMFS noted in its biological opinion on aquaculture in the Puget Sound that efforts to recapture escaped fish result in significant bycatch, the unintentional capture of other fish or marine species.[28] These efforts continue despite the likely resultant harm and infeasibility of recapture.[29] In Puget Sound, a "normal" year without a large-scale failure resulting in a massive fish escape nonetheless results in thousands of escaped fish, wreaking havoc on local wild fish populations and habitats.[30] These escaped fish can also travel into tributary rivers and streams, resulting in longer-term, and wider-ranging habitat effects.[31]

122.    The location of these facilities in the Exclusive Economic Zone's rough waters 300-200 miles offshore only increases the risk of fish escapes and will render recapture more difficult. For example, just last month, Hurricane Ian brushed right by the location of Velella Epsilon, the first offshore aquaculture facility for which EPA granted a NPDES permit, which has fortunately still not been placed in the

---

[27] *Id.*

[28] *See generally* NMFS, Reinitiation of Endangered Species Act Section 7(a)(2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Environmental Protection Agency's Approval of Washington State Department of Ecology's Sediment Management Standards (Feb. 16, 2022), https://wildfishconservancy.org/wp-content/uploads/2022/04/2022_02-16_FinfishRearingReinit_WCRO-2018-00286-3.pdf.

[29] *Id.* at 105.

[30] *Id.* at 126.

[31] *Id.* at 62-63.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1  Gulf.[32] And numerous hurricanes over the last decade have passed directly through

2  NMFS's Aquaculture Opportunity Areas, discussed *infra. See* Figures 1-3.



Figure 1: Hurricane Paths in the Gulf since 1992[33]

---

[32] *Hurricane Ian - Maps and images showing destruction*, BBC (Sept. 30, 2022), https://www.bbc.com/news/world-us-canada-63078606.

[33] *Id.*

COMPLAINT – 45
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770



Figure 2: NOAA, Proposed Sites in Gulf of Mexico Aquaculture Opportunity Area[34]

Figure 3: Map of Hurricane Paths in the Gulf of Mexico in 2020[35]

---

[34] *See* K.L. Riley et al., *An Aquaculture Opportunity Area Atlas for the U.S. Gulf of Mexico*, NOAA (2021), https://doi.org/10.25923/8cb3-3r66.

[35] Jonathan Kegges, *Tropical Tracker: A hurricane season in the Gulf of Mexico to remember, or forget* (Oct. 29, 2020), https://www.clickorlando.com/weather/2020/10/29/tropical-tracker-a-hurricane-season-in-the-gulf-of-mexico-to-remember-or-forget/.

COMPLAINT – 46
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

123.    The current climate crisis only exacerbates these impacts, as climate-fueled extreme weather events create a high likelihood of fish escapes. With respect to 233 documented fish escapes globally from 1995-2014, severe weather and storms caused 24 percent of the escapes.[36] And of all escapes, those caused by severe weather averaged 36 times as many fish lost compared to other common causes, such as net holes, predator attacks, human error, and undefined equipment failure.[37] And furthermore, "climate change can impact the production environment including pathogen prevalence and/or virulence and host susceptibility (immunosuppression) and transmission."[38]

### B.    Wildlife Impacts

124.    Industrial aquaculture also impacts wildlife in numerous ways. Industrial aquaculture facilities are made up of cages or net pens that confine finfish in a mesh enclosure,[39] often with flexible nylon or polyethylene nets.[40] Operators frequently deploy these cages and pens in groups or clusters, sharing common walkways, work areas, and protective netting.[41] The facilities remain in place with a complex system of anchors, chains, cables, and buoys.[42]

---

[36] CENTER FOR FOOD SAFETY, LIKE WATER AND OIL 6 (2014), http://www.centerforfoodsafety.org/files/like-water-and-oil-aquaculture_54029.pdf.

[37] *Id.*

[38] FOOD AND AGRICULTURE ORGANIZATION OF THE UNITED NATIONS, IMPACTS OF CLIMATE CHANGE ON FISHERIES AND AQUACULTURE 526 (2018), https://www.fao.org/3/i9705en/I9705EN.pdf.

[39] *Aquaculture Methods and Practices: A Selected Review*, FOOD & AGRICULTURE ORGANIZATION OF THE UNITED NATIONS, https://www.fao.org/3/t8598e/t8598e05.htm (last visited Nov. 1, 2022).

[40] *Id.*

[41] *Offshore Aquaculture Production*, Agric.Mktg. Res. Ctr. (Feb. 2022), https://www.agmrc.org/commodities-products/aquaculture/offshore-aquaculture-production.

[42] *Id.*

COMPLAINT – 47
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

125.    This design has resulted in and will continue to cause entanglements of endangered species and other wildlife. Current estimations indicate that entanglement in fishing gear, such as nets and lines, already results in the deaths of some 300,000 marine mammals each year.[43] Net pen facilities specifically include netting and long lines that can entrap wildlife, ESA-listed species, and other marine mammals and result in drowning. Of the 53 whale entanglements documented by NMFS in 2020, 55% of confirmed live and dead cases involved commercial or recreational fishing nets and lines, both of which are also present in aquaculture operations.[44]

126.    Specific to aquaculture net pens, in 2017 an endangered Hawaiian monk seal died after becoming trapped in a net pen in Hawaii state waters;[45] in 2016 an endangered Humpback whale died after becoming entangled in a net pen facility's anchor lines in Vancouver, B.C.;[46] and in August 2018 Cooke Aquaculture in Washington state waters entangled an endangered Humpback whale in the large gillnets it cast to recapture escaped farmed fish.[47]

---

[43] *Entanglement in fishing gear*, International Whaling Commission, iwchttps://iwc.int/management-and-conservation/entanglement.int (last visited Nov. 1, 2022).

[44] NOAA, 2020 LARGE WHALE ENTANGLEMENT REPORT 9 (2022), https://media.fisheries.noaa.gov/2022-06/National%20Report%20on%20Large%20Whale%20Entanglements%20Confirmed%20in%20the%20United%20States%20in%202020.pdf.

[45] Caleb Jones, *Rare monk seal dies in fish farm off Hawaii*, USA TODAY (March 17, 2017), https://www.usatoday.com/story/news/nation/2017/03/17/rare-monk-seal-dies-fish-farm-off-hawaii/99295396/.

[46] Glenda Luymes, *Dead humpback whale found entangled in empty aquaculture lines*, VANCOUVER SUN (Nov. 20, 2016), https://vancouversun.com/news/local-news/dead-humpback-whale-found-entangled-in-empty-aquaculture-lines.

[47] Terri Coles, *Humpback whale freed from net meant for escaped farm salmon in Hermitage Bay*, CBC NEWS (Aug. 14, 2018),

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

127.    Furthermore, industrial aquaculture creates noise pollution from both the facilities and the boats that serve them. Noise pollution can harm marine mammals by masking their communications at almost all frequencies these mammals use.[48] "Masking" refers to a "reduction in an animal's ability to detect relevant sounds in the presence of other sounds."[49] Such an impairment to communication could also result in harmful impacts to these protected species.

128.    Moreover, industrial aquaculture facilities' propensity to act as fish aggregating devices further exacerbates risks of entanglements and vessel strikes as species are drawn to the facilities. Industrial aquaculture may attract predators as a result of fish escapes, food drifting outside the pens, and other animals aggregating around the pens.[50] An increase in the presence of predators and other species could lead to adverse effects such as injury or death. The FAD effect results in more frequent encounters with wildlife and protected species, which could increase the likelihood of injury from structures or equipment associated with the facility.[51]

129.    Industrial aquaculture also results in light pollution, which harms species by affecting mating cycles and habits, as well as rendering fish more active

---

https://www.cbc.ca/news/canada/newfoundland-labrador/whale-caught-gill-net-cooke-aquaculture1.4784732.

[48] *See e.g.,* HILDEBRAND, J.A., IMPACTS OF ANTHROPOGENIC SOUND, IN MARINE MAMMAL RESEARCH: CONSERVATION BEYOND CRISIS (REYNOLDS, J.E. III ET AL. EDS., 2006); Linda S. Weilgart, *The Impacts of Anthropogenic Ocean Noise on Cetaceans and Implications for Management*, 85 Canadian J. Zoology 1091 (2007).

[49] NATIONAL RESEARCH COUNCIL, OCEAN NOISE AND MARINE MAMMALS 96 (2003), http://www.nap.edu/openbook.php?record_id=10564&page=R1.

[50] Luke T. Barrett et al., *Impacts of marine and freshwater aquaculture on wildlife: a global meta-analysis*, 11 REVIEWS IN AQUACULTURE 1022 (2018).

[51] *Id.*

COMPLAINT – 49
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

at night and increasing their exposure to predators.[52] Light pollution at night can also disorient marine birds.[53]

### C.   Socioeconomic Impacts

130.   In addition to the adverse environmental and public health impacts of industrial aquaculture, the activity also brings significant intertwined socioeconomic costs. For example, salmon farming, and its resulting constant supply of farmed salmon in the global market, has drastically reduced the price of salmon—wild or farmed—worldwide.[54]

131.   Industrial aquaculture may also displace local fishermen. The facilities could close off and essentially privatize large swaths of the ocean that are currently available for numerous other commercial purposes, including fishing, tourism, shipping, and navigation. Furthermore, the change in the availability of resources and wild fish stocks due to the prolonged presence of aquaculture may drastically alter the patterns and routes of commercial fishermen. Changing migration patterns, species displacement, or hypoxia may force wild fish and fishermen into new waters.

132.   These negative economic impacts fundamentally injure the cultural heritage of traditional fishing communities. Offshore industrial aquaculture creates competition that drives down the price of fish, and results in the loss of fishing and fishing-related employment and income.

---

[52] Forschungsverbund Berlin, *Light Pollution Makes Fish More Courageous*, SCIENCE DAILY (Sept. 21, 2018), https://www.sciencedaily.com/releases/2018/09/180921113456.htm.

[53] *Id.*

[54] Rosamond L. Naylor et al*., Salmon Aquaculture in the Pacific Northwest: A Global Industry with Local Impacts*, 45 Environment 18, 18-39 (2003).

COMPLAINT – 50
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

## II.    OFFSHORE AQUACULTURE REGULATION PRIOR TO NWP 56

133.    Countries around the world have already responded to these extensive environmental, socioeconomic, and public health problems associated with the industrial aquaculture industry through prohibitions. In August 2019, Denmark prohibited offshore aquaculture development for the entire country out of concern for the industry's impact on the environment.[55] And on June 30, 2021, Argentina followed suit, banning coastal salmon farming in net pens for purposes of environmental protection.[56] Even here in the United States, Washington State swiftly moved to phase out finfish aquaculture for non-native species in state waters following the massive Atlantic salmon spill in August 2017, *see supra* at ¶ 117, essentially shuttering all facilities in the state.

134.    Meanwhile, at the federal level, the United States continues to push for a brand-new industrial aquaculture industry. Since 2016, as outlined below, numerous federal agencies have sought to regulate offshore aquaculture, attempting to authorize aquaculture through a patchwork of statutes, guidance documents, and the May 2020 Executive Order.

135.    Although certain statutes authorize the use of federal funds to conduct limited research projects to examine the feasibility of offshore aquaculture in federal waters, no federal law currently authorizes industrial offshore aquaculture on the Outer Continental Shelf. Nor does any statute grant any agency the authority to

---

[55] *Denmark halts aquaculture development over environment concerns*, PHYS.ORG (Aug. 27, 2019), https://phys.org/news/2019-08-denmark-halts-aquaculture-environment.html.

[56] Christian Molinari, *Argentina's Tierra del Fuego bans coastal salmon farming*, SEAFOOD SOURCE (July 6, 2021), https://www.seafoodsource.com/news/aquaculture/in-historic-move-argentina-s-tierra-del-fuego-snubs-salmon-farming-industry.

COMPLAINT – 51
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

develop a regulatory regime or permitting scheme for commercial or industrial-scale aquaculture on the federally-controlled Outer Continental Shelf.

136.   Congress has consistently signaled that its express authorization is necessary for the disposition of the Outer Continental Shelf and its resources. For instance, in 2005, in response to concerns that the development of offshore renewable energy would be stalled because of uncertainty over whether energy companies could obtain the requisite property rights to construct renewable energy projects, Congress amended the OCSLA to authorize the Secretary of the Interior to issue leases, easements, and rights-of-way for specified "activities not otherwise authorized [by OCSLA], the Ocean Thermal Energy Conversion Act of 1980, or other applicable law." 43 U.S.C. § 1337(p)(1). Specifically, Congress authorized activities that support the development, extraction, and transportation of oil or natural gas; activities that support the development and production of energy from sources other than oil and gas; and activities that "use, for energy-related purposes or for other authorized marine-related purposes, facilities currently or previously used for activities authorized under" the OCSLA. *Id.*

137.   Consequently Congress, on at least five separate occasions, has introduced legislation with the support and at the behest of the Department of Commerce that would have established a permitting regime for offshore aquaculture operations in federal waters. *See* National Offshore Aquaculture Act of 2005, S. 1195, 109th Cong. (2005) (stating the legislation's purpose was "[t]o provide the necessary authority to the Secretary of Commerce for the establishment and implementation of a regulatory system for offshore aquaculture in the United States Exclusive Economic Zone"); National Offshore Aquaculture Act of 2007, H.R. 2010, 110th Cong. (2007) (same); National Sustainable Offshore Aquaculture Act of 2011, H.R. 2373, 112th Cong. (2011) (stating the legislation's purpose was "[t]o establish a regulatory system and research program for sustainable offshore aquaculture in the

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

United States exclusive economic zone"); Advancing the Quality and Understanding of American Aquaculture Act, S. 3100/H.R. 6258 (2020); Keep Finfish Free Act of 2019 (H.R. 2467). None of these bills have succeeded.

138.   In the absence of Congressional authorization and a comprehensive permitting scheme, agency attempts to regulate aquaculture have been met with opposition from environmental and fishing groups that oppose an unregulated industrial aquaculture industry in the United States.

A.   **Gulf of Mexico Litigation**

139.   Environmental and fishing groups first challenged NMFS's attempt to approve this industry in the Gulf of Mexico. On January 13, 2016, NMFS issued regulations for the first ever industrial aquaculture permit program in the Gulf, citing its "fishing" authority under the MSA. Fisheries of the Caribbean, Gulf, and South Atlantic; Aquaculture, 81 Fed. Reg. 1762, 1762 (Jan. 13, 2016). These regulations would have allowed the Gulf of Mexico Regional Fishery Management Council to approve five to twenty permits for aquaculture operations over a ten-year period in the Gulf's federal waters in a Fishery Management Plan.

140.   In response, conservation and fishing groups challenged the Fishery Management Plan, claiming, among other legal violations, that NMFS lacked authority to permit aquaculture. The plaintiffs argued that the MSA's plain language and legislative history indicate that industrial aquaculture is not "fishing," an action over which NMFS has jurisdiction under the MSA and consequently the aquaculture regulations were *ultra vires*. Alternatively, plaintiffs argued that NMFS failed to take a "hard look" at the Plan's direct, indirect, and cumulative impacts under NEPA and failed to consult under the ESA Section 7.

141.   In 2018, the district court agreed, granting the plaintiffs' motion for summary judgment and holding unequivocally that the MSA does not authorize the permitting of aquaculture facilities, and thus the agency exceeded its statutory

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

authority. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 341 F. Supp. 3d 632, 642 (E.D. La. 2018). The court rejected NMFS's attempt to permit the novel aquaculture scheme based on its authority over "fishing," concluding that the Department of Commerce "acted outside of its statutory authority in shoehorning an entire regulatory scheme into a single unambiguous word." *Id.* As a result, the district court vacated the regulations.

142.   In August 2020, the Fifth Circuit Court of Appeals affirmed the lower court's decision to vacate the nation's first commercial aquaculture permitting scheme in federal waters in the Gulf of Mexico and concluded that the MSA "unambiguously precludes the agency from creating an aquaculture regime." *Gulf Fishermens Ass'n v. NMFS*, 968 F.3d 454, 460 (5th Cir. Aug. 2020).

### B.   May 2020 Executive Order

143.   In May 2020, still without an authorizing statute to lean on, the Trump Administration stepped up its efforts to kickstart the offshore industrial aquaculture industry in an Executive Order titled, "Promoting American Seafood Competitiveness and Economic Growth." This Executive Order sought to streamline permitting for offshore industrial aquaculture under the guise of addressing pandemic-related food insecurity.[57] The Executive Order stated as its purpose strengthening the economy, ensuring food security, providing safe and sustainable seafood, supporting workers, promoting predictable federal actions, and removing regulatory burdens to offshore aquaculture.

144.   The Executive Order specifically required that within ninety days the Corps develop and propose for public comment the nationwide permit at issue here, authorizing structures for offshore finfish aquaculture in marine and coastal waters

---

[57] Promoting American Seafood Competitiveness and Economic Growth, Exec. Order No. 13921, 85 Fed. Reg. 28471 (May 12, 2020).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

out to the limit of the territorial sea and in ocean waters beyond the territorial sea within the Exclusive Economic Zone.

145.    The Executive Order also provided some hints of where the facilities authorized by NWP 56 may be located by mandating that the Secretary of Commerce identify "Aquaculture Opportunity Areas," which are geographic areas identified as containing locations suitable for commercial aquaculture.

146.    Both agencies have now complied with these mandates. On August 20, 2020, NMFS announced the designation of federal waters in the Gulf of Mexico and the Southern California Bight as Aquaculture Opportunity Areas. The agency followed up by releasing atlases showing specific locations in each region in November 2021,[58] then issued a scoping notice for programmatic EIS's for both Areas in May 2022.[59]

147.    And, central to this Complaint, the Corps issued NWP 56 on January 13, 2021, authorizing structures such as buoys, long-lines, floats, anchors, rafts, and racks in marine, estuarine, and waters overlaying the outer continental shelf for finfish aquaculture activities.

## II.    NATIONWIDE PERMIT 56

### A.    Proposed NWP 56

148.    The Corps began its NWP 56 permitting process just over three months following the Executive Order, publishing its proposed rule in the Federal Register

---

[58] *See* K.L. Riley et al., *An Aquaculture Opportunity Area Atlas for the U.S. Gulf of Mexico*, NOAA (2021), https://doi.org/10.25923/8cb3-3r66; James A. Morris Jr. et al., *An Aquaculture Opportunity Area Atlas for the Southern California Bight*, NOAA (2021), https://doi.org/10.25923/tmx9-ex26.

[59] NMFS, Notice of Intent to Prepare a Programmatic Environmental Impact Statement for the Gulf of Mexico Aquaculture Opportunity Area (June 1, 2022); NMFS, Notice of Intent to Prepare a Programmatic Environmental Impact Statement for the Southern California Aquaculture Opportunity Area (May 23, 2022).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

on September 15, 2020. 85 Fed. Reg. 57,298. The Corps included NWP 56 in its proposal to reissue 52 existing nationwide permits with modifications, to issue five new nationwide permits, and to reissue nationwide permit general conditions and definitions with modifications.

149.    Specific to the Executive Order, the Corps proposed two new nationwide permits: NWP A to authorize seaweed aquaculture activities in navigable waters of the United States, including federal waters on the Outer Continental Shelf, and NWP B (later renamed NWP 56) to authorize finfish aquaculture activities in these waters. The proposed NWPs A and B also allowed for multi-trophic species aquaculture activities in marine and coastal waters, including federal waters on the Outer Continental Shelf to allow aquaculture operators the flexibility to propagate additional species, such as mussels, on their seaweed or finfish aquaculture structures.

150.    Specifically, the Corps proposed NWP B to allow for permittees to install cages, net pens, anchors, floats, buoys, and other similar structures into navigable waters of the United States, including marine and estuarine waters and the Outer Continental Shelf. The Draft Document estimated that 25 operations may use this permit to install finfish aquaculture operations, impacting approximately fifty acres of coastal waters in five years. U.S. Army Corps, Draft Decision Document Nationwide Permit B, at 43 (Sept. 14, 2020).

151.    The Corps included all assessments in an attempt to satisfy the RHA, NEPA, the ESA, and the MSA in the Draft Decision Document. *Id.* at 3. However, the Corps' Draft Decisions' sparse analysis overlooked numerous impacts and left critical assessments to district engineers.

152.    First, to satisfy both its public interest review under the RHA and NEPA, the Corps considered factors such as conservation, economic impacts, aesthetics, other environmental concerns, wetlands, historic properties, fish and

COMPLAINT – 56
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

wildlife values, recreation, and water quality. Specifically, the Corps listed numerous impacts of aquaculture on ecosystems, such as fish escapes, pathogen and parasite transmission, discharge of antibiotics, and nutrient pollution, *id.* at 49-53, but ultimately reassured the public that division and district engineers will impose, as necessary, additional conditions on the NWP authorization or exercise discretionary authority to address locally important factors or to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects. *Id.* at 35-36.

153.   The Corps found that the nature and scope of the activities authorized by the NWP, general permit conditions, and regional conditions will "most likely restrict the extent of the beneficial and detrimental effects to the area immediately surrounding the finfish [aquaculture] activity." *Id.* at 63. However, the Corps stated it would wait until after reviewing comments to make a minimal effects determination under the RHA and to issue a FONSI. *Id.* at 67.

154.   Second, the Corps described potential impacts on wildlife, including endangered species. Specifically, the Corps listed threats such as entanglement, water pollution, and vessel traffic. *Id.* at 55-56. However, the Corps explained it did not need to undergo ESA Section 7 consultation because district engineers would complete ESA Section 7 consultation on an individual basis to ensure "no effect" to listed species or critical habitat. *Id.* at 35; 64-67.

155.   Further, while the Corps included a section on endangered species in its Draft Document, it failed to provide any analysis of the impacts of NWP 56 on listed species. The Draft Document failed to address the cumulative impacts of the NWP 56 program and provided no indication of how the agency would gather data to ensure that the impacts of an unlimited number of NWP 56 projects across the country will not jeopardize listed species.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

156.     This decision to defer consultation came just a few years following litigation before the Montana District Court over the 2017 iteration of NWP 12, where the court ruled that the Corps violated the ESA by failing to undertake programmatic Section 7 consultation to consider the cumulative adverse effects of NWP 12 on protected species. *Northern Plains Resource Council et al. v. U.S. Army Corps of Eng'rs*, 454 F. Supp 3d 985, 990-94 (D. Mont., Apr. 15, 2020); *see also Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005)(holding that programmatic consultation on NWP 12 was "necessary to avoid piece-meal destruction of … habitat through failure to make a cumulative analysis of the program as a whole.").

157.     And third, similarly, the Corps explained it would comply with the MSA at the regional level, meaning district engineers would add regional conditions to ensure no adverse effects on EFH. Draft Document at 45. The Corps explained that consultation may occur on a case-by-case or programmatic basis to ensure only minimal adverse effects on EFH. *Id.* at 57.

## B.    Public Comments

158.     In response, thousands of public commenters urged the Corps not to approve NWP 56 due to its cumulatively adverse impacts, considering its widespread approval of finfish aquaculture in federal waters where it has never before occurred. Commenters requested that the Corps not issue NWP B as written, or if the Corps did decide to move forward with NWP B, to complete a full EIS rather than an EA and to undertake ESA and EFH consultation at a programmatic level for several reasons.

159.     First, regarding environmental impacts under NEPA and the RHA's public interest review, commenters noted numerous deficiencies in the Corps' analysis. Namely, the Draft Document acknowledged harms from escaped fish (genetic contamination, disease transfer), pollutants, and nutrients from these

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

facilities, Draft Document at 46-48, 59-61, and admitted that they are likely to have adverse effects on the general environment, *id.* at 49-50, but included no mitigation measures to avoid this known harm. Instead, the Corps claimed it lacks authority to impose any of the conditions it identified that may mitigate these serious impacts. *Id.* at 47. The Corps relied on General Condition 23, which allows district engineers to minimize industrial aquaculture's adverse environmental effects at an individual level.

160.    Second, commenters noted that despite the Corps' admission that 25 operations may use this permit to install finfish aquaculture operations, the Corps provided no assessment of these facilities' size, nor their locations. Plaintiffs cited NMFS's Aquaculture Opportunity Areas, designated just one month prior, and commented that these locations should inform a substantial assessment of impacts from fish escapes, marine wildlife entanglements, or pollutants.

161.    Third, commenters noted that the Draft Document also excluded analyses of socioeconomic harms to traditional fishing communities from finfish aquaculture as well as disruptions to other marine-reliant industries, activities, and coastal communities. Commenters explained that boosting the production of farmed finfish, such as Atlantic salmon, directly harms thousands of small boat fishermen, each of whom represents an American small business, and endangers the economic future of our coastal communities. Despite these impacts, the Corps failed to acknowledge potential conflicts between traditional fishing (commercial, recreational) and these facilities. Instead, the one-paragraph description of economic impacts includes only the benefits of job creation and other economic benefits. Draft Decision at 48-49.

162.    Fourth, commenters informed the Corps it had failed to fulfill its duties to complete consultation under the ESA Section 7 and the MSA. Instead of consulting on NWP B as required, the Corps punted its duty to district engineers,

overlooking industrial aquaculture's impacts on federally listed species and EFH habitat from NWP 56 as a whole.

163.    And finally, commenters also opposed NWP 56 due to its interference with local tribes' treaty fishing rights. Specifically, commenters noted that treaty fishing rights in western Washington are not currently being met, and tribes have a treaty-secured interest in reversing this downward decline. Placement of buoys and aquaculture facilities will present physical obstructions to boats and fishing gear, thereby interfering with fishing rights. And offshore aquaculture spreads disease and parasites to wild fish populations, also interfering with fishing rights. Commenters insisted that the complexity and magnitude of commercial finfish aquaculture does not lend itself to a nationwide permit.

### C.    Final NWP 56 Issuance

164.    On January 13, 2021, the Corps published a final rule in the Federal Register reissuing twelve nationwide permits along with issuing four new nationwide permits, including NWP 56. 86 Fed. Reg. at 2744.

165.    NWP 56 authorizes structures in marine, estuarine, and waters overlaying the Outer Continental Shelf for finfish aquaculture activities for a period of five years. Decision Document at 1. The permit also authorizes "integrated multi-trophic" aquaculture structures for facilities that also have bivalve shellfish aquaculture and/or seaweed aquaculture in addition to finfish. *Id.* The structures authorized by NWP 56 include buoys, long-lines, floats, anchors, rafts, racks, and other similar structures. *Id.*

166.    The Decision Document estimates that NWP 56 may authorize approximately 25 activities over its five-year term, impacting approximately 50 acres of coastal waters. Decision Document at 52.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1

### i.    *Changes to the Final Decision*

2        167.    The 2021 NWP 56 Decision Document contains almost no new analysis

3    compared with the Draft Decision Document. <u>First</u>, the Corps made no further

4    efforts to assess site-specific or regional impacts before issuing NWP 56. In the NWP

5    56 Decision Document, the Corps expressly admitted to limiting its impact analysis

6    to national-scale impacts. Decision Document at 41, 75–76. The Corps simply

7    concluded that information regarding site-specific impacts is not readily available.

8    *See, e.g., id.* at 18 ("[I]t is not possible to describe the environmental conditions for

9    specific sites where the NWPs may be used to authorize eligible activities."); *id.*

10    ("Due to the large geographic scale of the affected environment (i.e., the entire

11    United States), … it is only practical to describe the affected environment in general

12    terms."); *id* at 50 ("The district engineer may add case-specific special conditions to

13    the NWP authorization to address site-specific environmental concerns.").

14        168.    <u>Second</u>, the Corps did not analyze quantitative data regarding potential

15    impacts. In the NWP 56 Decision Document, the Corps expressly admitted to

16    limiting its impact analysis to a "qualitative analysis" of the general, national-scale

17    impacts. Decision Document at 48 ("Given the geographic scope in which this NWP

18    can be used to authorize activities that require DA authorization and the wide

19    variability in aquatic resource structure, functions, and dynamics from site to site

20    and from region to region, the analysis of environmental consequences is a

21    qualitative analysis."). The Corps bluntly claimed that quantitative data regarding

22    nationwide impacts is not available. *See, e.g. id.* at 35 ("There is little national-level

23    information on the current ecological state of the Nation's wetlands, streams, and

24    other aquatic resources, or the general degree to which they perform various

25    ecological functions."); *id.* at 47 ("The analysis of environmental consequences in this

26    environmental assessment is a qualitative analysis because of the lack of

27    quantitative data at a national scale on the various human activities and natural

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

factors that may concurrently alter the current environmental setting during the 5-year period this NWP is expected to be in effect.").

169.   Third, the Corps also failed to provide quantitative data regarding the cumulative effects of NWP 56 other than the estimated number of times the permit will be used on a national basis over five years. *Id.* at 52. Despite recognizing that "repetitive disturbances at a single site over time" and "multiple activities occurring in a geographic area over time," *id.* at 42, can have cumulative effects, the Corps admitted to limiting its cumulative analysis to the agency's estimates on the number of activities authorized on a nationwide scale, ignoring data on the nature or location of the estimated uses. *Id.* at 42 ("[T]he cumulative impacts of this NWP are the product of how many times this NWP is used ... across the country during the 5-year period this NWP is anticipated to be in effect.").

170.   Fourth, the Corps completely failed to address many of the concerns Plaintiffs and other commenters raised during the public comment period. For example, the Decision Document does not consider the adverse impacts of these facilities on traditional fishing communities, nor disruptions to other marine-reliant industries, activities, and coastal communities. The Decision Document also fails to assess impacts on indigenous communities and treaty fishing rights.

171.   And finally, for many of the impacts the Corps did acknowledge, it limited its evaluation of direct, indirect, and cumulative impacts to the structures themselves, claiming it lacks authority to regulate the aquaculture facilities' operation and thus need not consider aquaculture impacts at all. *Id.* at 46 ("Since the Corps does not have the authority to prevent or control the environmental impacts caused by those 'but for' operational activities, the Corps does not have to conduct detailed analyses of these operational activities."). For example, the Corps refused to analyze the reasonably foreseeable impacts of antibiotic use, acknowledging only that their release "can affect other organisms" and that antibiotics "may also

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

accumulate in benthic substrates, where they may persist in the sediments for a few days to several years." *Id.* at 65. But the Corps refused to engage in further assessment of the actual impacts of that accumulation and release because "[t]he Corps does not have the authority to control the use of antibiotics." *Id.* at 60.

172.     Similarly, the Corps acknowledged adverse impacts from pathogen and disease transfer, stating in just two sentences that (1) fish escapes "may … increase the risk of transmitting pathogens and parasites (e.g., sea lice) that can cause outbreaks of diseases, and facilitate the movement of pathogens and parasites from one place to another"; and (2) that "[t]here is potential for pathogens to be transferred from cultivated finfish to wild finfish, and some of these pathogens may be non-native." *Id.* at 59-60. But again, the Corps went no further in assessing the socioeconomic, environmental, and public health impacts of pathogen and parasite spread in the EEZ because "the Corps does not have the authority to regulate potential pathogen transfers between cultivated finfish and wild finfish stocks." *Id.* at 60.

173.     Regarding fish escapes, the Corps even *admitted* that "[c]ultivating finfish species in ocean waters outside their native ecoregions should be considered a *high risk activity* that could potentially have *substantial adverse ecological and socioeconomic outcomes.*" Decision Document at 59 (emphases added). But the Corps' list of general impact descriptions raised by commenters excludes any location-specific assessment, mitigation measures to reduce escapes, or socioeconomic impacts because "[t]he Corps does not have legal authority to regulate the potential escapement of cultivated finfish." Decision Document at 13.

174.     Rather than provide thorough assessments on impacts on the EEZ and fishing/indigenous communities, the Corps punted the duties to mitigate these critical impacts to district engineers, who by the Corps' own logic would also lack authority. The Corps broadly stated that "[d]ivision and district engineers have the

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

authority to … add conditions to the NWP either on a case-by-case or regional basis to require mitigation measures to ensure that the cumulative adverse environmental effects of these *activities* are no more than minimal." Decision Document at 42 (emphasis added). Specifically, the Corps punted the duty to mitigate these "high risk" fish escapes with "substantial adverse" outcomes to district engineers, who the Corps claimed can address fish escape impacts through the ESA section 7 consultation process. *Id.* at 59.

175.    Despite these deficiencies, the Corps made a FONSI under NEPA, *id.* at 83, and a determination of minimal individual and cumulative adverse effects on the aquatic environment under the RHA. *Id.* at 84.

176.    With respect to the Corps' public interest review, the Corps' Decision Document insists that the "NWP is consistent with 33 C.F.R. 320.4(g), which states that an inherent aspect of property ownership is a right to reasonable private use." The Corps insists that NWP 56 is consistent with the public interest because "[i]n federal waters on the outer continental shelf, the project proponent may be required to obtain a lease or other form of permission from the Department of Interior." Decision Document at 77. However, as the Corps well knows, the Department of Interior has no authority to authorize industrial aquaculture on the federally-controlled Outer Continental Shelf. However, rather than grapple with the serious constitutional and regulatory concerns raised by NWP 56, the Corps instead relied on a conclusory statement to avoid considering the impacts of its action on the federal property interest.

177.    The Corps' Decision Document references a Biological Assessment dated January 2, 2021 for the Corps' proposal to reissue 52 existing nationwide

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

permits and to issue five new nationwide permits, including NWP 56.[60] The Biological Assessment includes lists of hundreds of threatened and endangered species obtained from the wildlife agencies but does not include evaluations of the potential effects of any particular nationwide permit on any of those species or their critical habitats, or assess cumulative impacts of NWP 56 on ESA-listed species. Despite the Corps' acknowledgement of a wide array of potential environmental effects, including to threatened and endangered species, the agency concluded that its issuance of NWP 56 has "no effect" on threatened and endangered species or on designated critical habitat and did not consult with FWS or NMFS in concluding that programmatic ESA consultation was not required. Decision Document at 79; Biological Assessment at 46-47.

178.    Similarly, the Corps did not complete consultation under the MSA, again relying on district engineers to conduct EFH consultation with NMFS if a district engineer determines a proposed activity may adversely affect EFH. Decision Document at 71. The Corps also stated that district engineers can impose regional and special conditions to ensure that activities authorized by this nationwide permit will result in only minimal adverse effects on EFH. *Id.* at 71.

### ii.    *Wildlife Impacts*

179.    Contrary to its FONSI and "no effect" determination, the Corps' Decision Document provides general descriptions of numerous adverse effects on aquatic species and federally threatened or protected species. First, the Corps acknowledged that "[e]quipment used for finfish [aquaculture] activities, such as cages, net pens, lines, cables, and anchors, may impede bird feeding activity and trap birds." Decision Document at 67. Second, regarding marine mammals and sea

---

[60] ARMY CORPS, BIOLOGICAL ASSESSMENT FOR PROPOSED ISSUANCE AND REISSUANCE OF THE 2021 NATIONWIDE PERMITS (Jan. 2, 2021), https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/16833.

COMPLAINT – 65
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

turtles, the Corps acknowledged that aquaculture equipment may result in entanglement. *Id.* at 70. "The presence and operation of aquaculture gear may also cause behavioral modification to wildlife via exclusion from important habitats." *Id.* at 69-70. And third, for wild fish species, aquaculture can harm wild fish populations "where fish meal derived from the harvesting of wild fish stocks is used to feed the cultivated finfish." *Id.* at 68. Escaped fish can also have "adverse effects on wild fish populations by competing with those wild fish for food and other resources, transferring diseases and pathogens, and interbreeding between the cultivated fish and wild fish that may reduce the fitness of those species to survive and reproduce." *Id.* at 68.

180.   The Corps also explained that finfish aquaculture may indirectly affect fish and wildlife, such as marine mammals, sea birds, sea turtles, and fish. *Id.* at 69. For example, finfish aquaculture may indirectly decrease fish populations by attracting fish and rendering them more vulnerable to capture by humans or other predators. *Id.* at 69.

### iii.   Environmental Impacts

181.   The Corps also acknowledged a wide breadth of other environmental impacts associated with permitting industrial aquaculture, which it claims no authority to mitigate. First, the Corps acknowledged the pressures industrial aquaculture places on wild fisheries to produce feeds for cultivated finfish. Decision Document at 62. Finfish aquaculture activities can have adverse effects on wild fish populations where fish meal derived from the harvesting of wild fish stocks is used to feed the cultivated finfish. *Id.* at 46, 68.

182.   Second, the Corps acknowledged water pollution from industrial aquaculture facilities. These facilities contribute to nutrient pollution through releasing unconsumed feed and feces directly into surrounding waters. "Therapeutic chemicals may be administered in feeds or through immersion, and they may be

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

released into the aquatic environment through unconsumed food, feces when the chemicals have not been fully metabolized, or through direct discharges into the water column." *Id.* at 66. These discharges can alter benthic communities, *id.* at 69, release heavy metals into the surrounding environment, *id.* at 74, and contribute to harmful algal blooms. *Id.* at 60.

183.    Third, the Corps discussed harmful impacts from escaped fish, which the Corps admitted "are not completely preventable." *Id.* at 58. Escaped fish may compete with wild fish stocks for food and space and interbreed, which could cause long-term declines in the fitness and productivity of wild finfish populations. *Id.* at 58. Escaped fish may also destroy nests made by individuals of wild finfish species in their natural habitats, *id.* at 58, and spread disease. *Id.* at 59.

184.    And finally, the Corps acknowledged water quality impairment due to the application of antibiotics, therapeutics, pesticides, and other chemicals. *Id.* at 46. The Corps acknowledged harm to coral from pesticides, *id.* at 37, and accumulation of antibiotics in benthic substrates, where they may persist in the sediments for a few days to several years. *Id.* at 65. However, the Corps provided no assessment of impacts of these discharges on ecosystems in the EEZ specifically because, as discussed *supra*, it claimed these discharges fall outside its authority. *Id.* at 46, 60.

### iv.    *Cumulative Impacts*

185.    The Corps issued NWP 56 without full consideration of the cumulative impacts. In the Decision Document, the Corps summarily concluded that operations would not have significant cumulative impacts on the environment because district engineers will either revoke or modify permits they determine will result in more than minimal cumulative impacts. Decision Document at 43, 49 (stating district engineers will conduct more detailed assessments and "[d]istrict engineers will monitor the use of this NWP on a regional and case-specific basis, and under their authorities in 33 CFR 330.5(c) and (d), modify, suspend, or revoke NWP

authorizations in situations when the use of the NWP will result in more than minimal cumulative adverse environmental effects."). Overall, however, the Corps simply stated that "the cumulative impacts of this NWP are the product of how many times this NWP is used to authorize structures in navigable waters of the United States." *Id.* at 42. Future compensatory mitigation measures, the Corps claims, will also reduce cumulative impacts below the minimal threshold on a case-by-case basis. *Id.* at 49. The Corps also reasoned that "[b]ecause the activities authorized by this NWP constitute only a small proportion of the categories of human activities that directly and indirectly affect ocean and estuarine waters, the activities authorized by this NWP over the next 5 years are likely to result in only a minor incremental change to the current environmental setting for ocean and estuarine waters and the ecological functions and services they provide." *Id.* at 49-50.

### v. *General Conditions*

186.    The Corps used several of its general conditions, applicable to all sixteen nationwide permits authorized or reauthorized on January 2021, to punt its responsibility to ensure only minimal impacts to district engineers. First, General Condition 32 provides the informational requirements for preconstruction notices that prospective permittees must submit to district engineers, such as timing, contents, and procedures for agency coordination. 86 Fed. Reg. at 2873-74. All activities authorized under NWP 56 require applicants to submit PCNs to district engineers. *Id.* at 2808.

187.    Second, the Corps also included General Condition 18, which provides the requirement for permittees to submit PCNs for any proposed activity they believe might affect ESA-listed species or designated critical habitat, if listed species or designated critical habitat are in the vicinity of the proposed activity, or if the proposed activity is located in critical habitat. The Corps relied entirely on General

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

Condition 18 to satisfy its duty under the ESA without conducting a programmatic ESA consultation. The Corps claimed this determination was appropriate because General Condition 18 and the Corps' regulation at 33 C.F.R. 330.4(f) require "activity-specific" ESA consultations if an activity authorized by NWP 56 "may affect" ESA-listed species. Biological Assessment at 47. In so doing, the Corps also delegated initial ESA effects determinations to non-federal permittees, as NWP 56 immediately authorizes "activities proposed by non-federal entities that do not meet the 'might affect' threshold of general condition 18 and that are not located in designated critical habitat (or critical habitat proposed for such designation)." *Id.* at 33.

188.    And finally, the Corps relied on General Condition 23 to minimize all of the adverse impacts described in its Decision Document to a level below the minimal threshold. 86 Fed. Reg. at 2870-72. Under General Condition 23, district engineers determine on a case-by-case basis whether specific activities authorized by NWP 56 should require compensatory mitigation or other forms of mitigation to ensure the authorized activities result in no more than minimal individual and cumulative adverse environmental effects. *Id.* District engineers can require the project proponent to submit a mitigation plan if, after reviewing a PCN, the district engineer determines that mitigation is necessary to ensure the authorized activity will cause no more than minimal individual and cumulative adverse environmental effects. *Id.* at 2871.

### vi.    *Regional Conditions*

189.    Beyond mitigation measures imposed under General Condition 23, the Corps relied on regional conditions imposed by districts to keep impacts below the minimal threshold. The Corps repeatedly stated in the Decision Document that division and district engineers can modify nationwide permit authorizations on a regional basis to ensure that the nationwide permit authorizes only those activities

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

that result in no more than minimal individual and cumulative adverse environmental effects. Decision Document at 17, 18, 45, 43 ("Division and district engineers will impose, as necessary, additional conditions on the NWP authorization or exercise discretionary authority … to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects."); *see also id.* at 51 ("Regional conditions added to this NWP will be used to account for differences in aquatic resource functions, services, and values across the country, ensure that the NWP authorizes only those activities with no more than minimal individual and cumulative adverse environmental effects.").

190.   The Corps also relied on regional conditions to ensure that NWP 56 does not harm EFH under the MSA. *Id.* at 71 ("Division and district engineers can impose regional and special conditions to ensure that activities authorized by this NWP will result in only minimal adverse effects on essential fish habitat."). And the Corps insists that regional conditions will help ensure compliance with the ESA. *Id.* at 82.

191.   However, the majority of the sixteen districts (excluding only New England, *see* Ex. C)[61] that adopted NWP 56 have not imposed any regional conditions beyond the general conditions. Rather, many of these districts only included regional conditions applicable to all sixteen NWPs authorized on January 13, 2021, which simply repeat the general conditions for PCNs already required for each project under NWP 56. For example, the Galveston, Honolulu, and Seattle Districts elected not to impose any regional conditions for NWP 56, *see* Exs. D-F,

---

[61] As of March 15, 2021, the Mobile District had not yet approved NWP 56 because the Alabama Department of Environmental Management requires individual Coastal Zone Management Act consistency determinations. Ex. D at 1-2. Plaintiffs filed a Freedom of Information Act request with the Mobile District in May 2022 and received a "no records" response for a supplemental decision document for NWP 56 on June 21, 2022.

COMPLAINT – 70
Case No. 22-1627

while Jacksonville, Los Angeles, San Francisco, and Norfolk included regional conditions for all sixteen NWPs that only reiterated the PCN requirement for conditions specific to their districts, which NWP 56 already requires for each permittee. *See* Exs. H-J.

192.    Other districts around the country added only informational requirements and additional assessments for PCNs and nothing else. For example, Charleston's only regional condition requires PCNs to include: (1) a map or depiction that shows the adjacent properties and adjacent property owners' contact information; and (2) a signed letter of "no objection" to the proposed activity from each of the adjacent property owners when activities will occur adjacent to property that prospective permittees do not own. Ex. K at 4-5. Similarly, the New York District added additional guidelines for what applicants need to submit in their PCNs, such as quantity and dimensions of all proposed structures; a drawing showing how the gear will be deployed on the site; assessments regarding wastes from cage cultures, escapees and invasives, genetic pollution, disease and parasite transfer, and habitat modification; a siting analysis; and a discussion regarding impacts to competing user groups. Ex. L at 3. In the Norfolk District, the only additional regional condition requires PCNs to include specific information such as general water depths, sediment characteristics of the bottom substrate, benthic species present; a description of the quantity and dimensions of all proposed structures; a vicinity map showing the project location; a schematic or drawing showing how the gear will be deployed on the site; and the names and quantities of the species that will be cultivated. Ex. J at 4. The Philadelphia District similarly added numerous information requirements for PCNs for waters in the State of Delaware and in waters of the United States near and including the Chesapeake and Delaware Canal in Maryland, requiring prospective permittees to describe "(1) what measures have been taken to avoid impacts on aquatic resources, (2) what measures

have been taken to avoid and/or minimize any discharges into wetlands or waters of the United States, and (3) what measures have been developed to compensate for any impacts to wetlands or waters of the United States," as well as information about location, equipment, and species. Ex. M at 20-21. The Savannah District also required detailed project drawings in PCNs. Ex. N at 50.

193.    Other districts added regional requirements to mark the facilities for navigation purposes. The New York District included a requirement that permittees clearly mark structures with marine grade beacons and retroreflective material identifiable to mariners within at least 100 yards. Ex. L at 3. The Philadelphia District required permittees to tag all structures to display the owner's name, address, and permit number, marked in accordance with U.S. Coast Guard requirements to protect navigation in the State of Delaware and in waters of the United States near and including the Chesapeake and Delaware Canal in Maryland. Ex. M at 27; *see also* Ex. O at 29 (regional conditions for New Jersey). And Wilmington prohibited lease sites in marked or unmarked established navigation channels. Ex. P at 72.

194.    Only a handful of districts imposed regional conditions to protect local ecosystems. For example, New Orleans prohibited any adverse impacts upon federal or state designated rookeries and/or bird sanctuaries. Ex. Q at 1. The Philadelphia District required that permittees in Delaware waters and just beyond avoid in-water work from March 1 to June 30 in all waters to protect diadromous fish migrations and spawning, Ex. M at 25; *see* Ex. O at 27 (requiring the same for New Jersey waters); limited in-water work in certain areas to protect the American horseshoe crab, Ex. M at 26; Ex. O at 28 (NJ); and added specific requirements for permittees to comply with the ESA and MSA. Ex. M at 23-25. Savannah prohibited projects that would impact compensatory mitigation sites unless a project's purpose is to enhance the mitigation site or bank. Ex. N at 49. And Wilmington prohibited sites within

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

twenty feet of a wetland area, unless approved by the Corps and NMFS, Ex. P at 72, and required programmatic biological opinions for all nationwide permits and adherence to its Manatee Guidelines. *Id.* at 70.

195.    No General or Regional Condition requires the Corps to ensure that each applicant has the requisite property rights to proceed with the activity to be authorized by NWP 56. Instead, the Corps must rely on the affirmation of individual applicants. However, there is no mechanism by which applicants can obtain the requisite property rights to conduct industrial aquaculture activities on the federally-controlled Outer Continental Shelf.

196.    Despite these sparse regional conditions, state adoptions indicate that NWP 56 will likely impact a much larger area than the 50 acres the Corps estimated. Decision Document at 52. The Galveston District alone predicts it will receive ten PCNs *per year*, Ex. D at 47, affecting twenty-five acres. *Id.* at 48.

197.    And the Jacksonville District has already received an application for the 388.5-acre Manna Fish Farms, which it produced in response to a Freedom of Information Act request for all PCNs already submitted. Ex. R at 1-4. In 2019, the Jacksonville District received an RHA Section 10 application for Manna Fish Farms, an industrial finfish facility approximately 23 nautical miles southeast of Pensacola, Florida in the federal waters of the Gulf of Mexico in water depths ranging from 45-50 meters. *Id.*

198.    Manna Fish Farms aims to initially place two net pens in the Gulf and increase to twelve within five years for the purpose of producing Red Drum, *id.* at 2. For the first year, Manna projects it will produce 600,000 pounds annually with one cage, 1,200,000 pounds the second year with four cages, 3,600,000 pounds annually from years 3-5 with twelve cages, and 5,400,000 pounds annually from years 5-10 with eighteen cages. *Id.* at 52. This level of production will require 12,557 pounds of

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

feed per day for the first year, 24,939 the second year, 74,816 pounds per day from years 3-5, and 112,224 pounds per day from years 5-10. *Id.*

199.    The Seattle District has also received a PCN for a large aquaculture facility in Oak Harbor. *See* Ex. S. On October 1, 2021, Oak Harbor Marina Salmon Rearing Program submitted a Joint Aquatic Resources Permit Application to the Corps, received by a Plaintiff in response to a Freedom of Information Act request for PCNs. The proposed project would produce 30,000 salmon in two net pens, size 30 feet by 15 feet. *Id.* at 5.

### FIRST CLAIM FOR RELIEF

VIOLATION OF THE CONSTITUTION'S PROPERTY CLAUSE, THE SEPARATION OF POWERS, THE RHA, AND THE APA:

*ULTRA VIRES* ACTION AUTHORIZING AQUACULTURE ON THE OUTER CONTINENTAL SHELF

200.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1-199 in the Complaint as if fully set forth herein.

201.    Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

202.    The Constitution grants to Congress the exclusive authority to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Congress's "power over the public land thus entrusted to Congress is without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citation omitted) (internal quotation marks omitted).

203.    There is no provision in the Constitution that authorizes the President or any agency of the executive branch to enact, amend, or repeal statutes, including appropriations already approved by Congress and signed into law by the President. *Clinton v. New York*, 524 U.S. 417, 438 (1998). Rather, "[t]he President's authority to act, as with the exercise of any governmental power, must stem either from an act

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

of Congress or from the Constitution itself[,] or from a combination of the two."
*Medellin v. Texas*, 552 U.S. 491, 524 (2008) (citation omitted) (internal quotation marks omitted).

204.    Congress has limited the authority of the Executive Branch, including Defendants, to authorize activities on the federally-controlled Outer Continental Shelf and the use of its resources. Although Congress has considered several bills to authorize industrial aquaculture on the federally-controlled Outer Continental Shelf, none have been adopted. There is no federal statute authorizing the use of the federally-controlled Outer Continental Shelf or its resources for industrial aquaculture. Consequently, Congress has not provided for the disposition of the federally-controlled Outer Continental Shelf for those purposes, nor has it delegated any authority—either express or implied—to any agency to authorize, regulate, or permit industrial aquaculture.

205.    Defendants have nonetheless issued NWP 56 which goes beyond the limitations imposed by Congress by authorizing the installation of industrial aquaculture facilities on the federally-controlled Outer Continental Shelf and the use of its resources for those purposes. As correctly interpreted by the Corps itself, the RHA states that a Section 10 permit is necessary, but not sufficient to authorize the construction of an obstruction to navigation on the Outer Continental Shelf, *see* 33 C.F.R. § 320.4(g)(6), as prospective permittees also need Congressionally granted property rights to construct an industrial aquaculture facility on the federally-controlled Outer Continental Shelf. None of the General or Regional Conditions applicable to NWP 56 require applicants to affirmatively demonstrate that they have acquired the requisite property rights to conduct the activities authorized by the permit.

206.    It is a cardinal principle of administrative law that an agency may act only pursuant to authority delegated to it by Congress. *See, e.g., Lyng v. Payne*, 476

COMPLAINT – 75
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."). The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

207.   By taking executive action to authorize the disposition and use of the federally-controlled Outer Continental Shelf for industrial aquaculture without Congressional approval, the Corps' issuance of NWP 56 which authorizes such activities and infringes on the federal property interest usurps Congress's authority and violate the Constitution's Property Clause, U.S. Const. art. IV, § 3, cl. 2, and the doctrine of separation of powers laid out in Articles I and II of the Constitution.

208.   Accordingly, the Corps has acted "contrary to constitutional right, power, privilege, or immunity" in violation of the APA. 5 U.S.C. § 706(2). The Corps' actions are likewise *ultra vires* and in excess of the agency's statutory authority pursuant to the RHA and APA. 33 U.S.C. § 403; 5 U.S.C. § 706(2).

209.   The actions and inactions of Defendants described in this Cause of Action are causing injuries to Plaintiffs, for which they have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF THE RHA AND APA:

### FAILURE TO CONSIDER PROPERTY OWNERSHIP
### IN PUBLIC INTEREST REVIEW

210.   Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1-209 in the Complaint as if fully set forth herein.

211.   The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

accordance with law." 5 U.S.C. § 706(2). Agency actions are arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

212.   When issuing a nationwide permit, the Corps must assess the effects of the permit on the public interest. 33 C.F.R. § 320.4(a)(1). Relevant here, the Corps' public interest review must include consideration of property ownership. *Id.*

213.   The Corps' Decision Document insists that the "NWP is consistent with 33 CFR 320.4(g), which states that an inherent aspect of property ownership is a right to reasonable private use." Decision Document at 77. The Corps concludes that NWP 56 is consistent with the public interest because "[i]n federal waters on the outer continental shelf, the project proponent may be required to obtain a lease or other form of permission from the Department of Interior." *Id.*

214.   The Department of Interior has no authority to authorize industrial aquaculture on the federally-controlled Outer Continental Shelf.

215.   By relying on the conclusory and false assertion that applicants planning aquaculture activities in federal waters "may be required to obtain a lease or other form of permission from the Department of Interior" to conclude that NWP 56 is "consistent" with the public interest, *id.* at 77, the Corps avoided any meaningful evaluation of the serious concerns regarding the effects of NWP 56 on the federal property interest. In so doing, the Corps violated the RHA and its implementing regulations, *see* 33 C.F.R. § 320.4, and acted arbitrarily, capriciously, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

216.    The Corps' actions in furtherance of NWP 56 are therefore unlawful and must be enjoined and set aside.

217.    The actions and inactions of Defendants described in this Cause of Action are causing injuries to Plaintiffs, for which they have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
VIOLATION OF RHA AND APA:

AUTHORIZATION OF NWP 56 WITH ADVERSE CUMULATIVE IMPACTS AND FAILURE TO DOCUMENT IMPACTS AND MITIGATION MEASURES

218.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1-217 in the Complaint as if fully set forth herein.

219.    The Corps may issue general permits (including nationwide permits) only for activities that will cause no more than minimal adverse effects to the environment, either individually or cumulatively. 33 C.F.R. § 322.2(f). In issuing a nationwide permit, the Corps must consider the separate and cumulative impacts from the permit on the environment and make a finding that the permit will not have more than minimal adverse cumulative impacts. *Id.*

220.    As detailed above, the Corps has violated the RHA's implementing regulations by issuing a nationwide permit that will have more than minimal adverse cumulative effects on the environment due to the nature and extent of industrial finfish aquaculture activities that NWP 56 will permit and the lack of protections for impacted habitats and species.

221.    Although the individual authorizations for several acres at a time may be individually minor (although not always), the cumulative impact of sixteen districts approving facilities for industrial finfish production is more than minimal, with adverse impacts to water quality and wildlife, including forage fish, benthic species, and ESA-protected species like salmon, whales, and birds. As detailed above,

industrial finfish production, along with the equipment and gear associated with finfish aquaculture, kills or harms wildlife and their food sources, impacts water quality, and overall has more than minimal impacts. NWP 56 will allow commercial finfish aquaculture in EFH, as well as critical habitat for ESA-protected species. Indeed, the Corps admitted that NWP 56 will allow an expansion of industrial finfish aquaculture to fifty acres, while the Galveston District alone predicts twenty-five acres, and the Jacksonville District has already received an application for 388.5 acres. The adverse cumulative impacts from these facilities render the use of NWP 56 unlawful under the RHA regulations.

222.    Furthermore, as detailed above, the Corps failed to adequately support its determinations as to the impacts, including cumulative impacts, of finfish aquaculture under NWP 56, including to wildlife, and other aspects of the environment.

223.    The Corps must set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under a nationwide permit, and provide documentation to support each factual determination, including cumulative impacts. 33 C.F.R. § 322.2(f). If the Corps relies on mitigation measures to meet the standard in its RHA regulations for general permits (no more than minimal adverse cumulative impacts), it must adequately document those mitigation measures and their efficacy. *Id.*

224.    However, in its Decision Document, the Corps acknowledged some adverse impacts of finfish aquaculture activities yet discounted them either based on (1) the Corps' purported lack of authority, or (2) the use of unspecified conditions (or mitigation measures) to be determined by the district engineer for each authorization. On the first note, the Corps' regulations plainly state the Corps must base its minimal impacts determination on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity *and its intended use* on the

public interest." 33 C.F.R. § 320.4(a)(1) (emphasis added). As a result, the Corps needed to assess all impacts of the facilities' *use* on surrounding waters, including fish escapes, water quality degradation, and disease spread. The Corps even admits this by repeatedly stating that district engineers will mitigate impacts of aquaculture operations.

225. On the second point, the Corps' determination that finfish aquaculture activities on a disputed number of acres will not have a cumulative adverse impact to aquatic resources is unsupported. The Corps relied on mitigation measures to meet the regulatory requirement that NWP 56 will have no more than minimal cumulative impacts but failed to adequately document those mitigation measures and their efficacy. The Corps based its determination on mitigation measures to be added at the discretion of district engineers, but then failed to document what those mitigation measures will be, or support their presumed success.

226. By failing to adequately document and support the Corps' factual determinations as to the impacts of NWP 56, including cumulative impacts, or the effectiveness of the Corps' mitigation measures, the Corps' NWP 56 authorization was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, in violation of the Corps' implementing regulations and the APA. 5 U.S.C. §§ 701-706.

227. And by adopting a nationwide permit with more than minimal adverse cumulative impacts, which may cause or contribute to significant degradation, and which is contrary to the public interest, the Corps has violated its duty under the RHA's implementing regulations, and its authorization is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, in violation of its implementing regulations and the APA. 5 U.S.C. §§ 701-706.

COMPLAINT – 80
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

228.    The actions and inactions of the Defendants described in this Claim for Relief are causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
VIOLATION OF NEPA AND APA:

FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT
AND FAILURE TO PROPERLY ANALYZE
DIRECT, INDIRECT, AND CUMULATIVE IMPACTS

229.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1-228 in the Complaint as if fully set forth herein.

230.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "If any 'significant' environmental impacts might result then an EIS must be prepared before the action is taken." 40 C.F.R. § 1508.1(q)(3)(i).

231.    NEPA prohibits an agency from avoiding significance, and thus from performing an environmental assessment, by dividing a proposed project into component parts. *Id.* § 1502.4(a). A federal agency should prepare a programmatic EIS for the adoption of new agency programs. *Id.* § 1502.4(b); *id.* § 1508.1(q)(3)(iii). A programmatic EIS ensures that an agency's NEPA review is "relevant to the program decision and timed to coincide with meaningful points in agency planning and decision making" and "should be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives." *Id.* § 1502.4(b).

232.    An EIS, including a programmatic EIS, must disclose all the consequences of the proposed action, including the direct, indirect, and cumulative effects. *Id.* § 1508.1(g). In addition to direct and indirect, a cumulative effect results

from the incremental impact of the proposed action "when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency … undertakes such other actions." *Id.* § 1508.1(g)(3).

233.    As detailed above, the Corps' decision to authorize NWP 56 involves significant direct, indirect, and cumulative impacts; poses risks to species protected under the ESA; and poses risks to EFH. Specific to fish escapes, the Corps itself admits that "[c]ultivating finfish species in ocean waters outside their native ecoregions should be considered a *high risk activity* that could potentially have *substantial adverse ecological and socioeconomic outcomes.*" Decision Document at 59 (emphases added). Yet the Corps refused to prepare a programmatic EIS.

234.    Furthermore, despite the detailed information provided to the agency by commenters, the Decision Document fails to take a "hard look" at numerous direct, indirect, and cumulative impacts from various finfish aquaculture activities, including but not limited to socioeconomic harms to fishing communities and indigenous groups; harms to ecosystems and public health from antibiotic use and spread of disease from farmed fish to wild fish; impacts to wildlife and ocean ecosystems from fish escapes; threats to wildlife, including threatened and endangered species, that depend on the essential marine habitats (including from food competition and habitat conversion); impacts to water quality; and recreational and aesthetic impacts.

235.    To satisfy NEPA's cumulative impacts mandate, the Corps needed to adequately consider the cumulative impacts of NWP 56 in combination with other actions, including any other actions that could affect the marine environment impacted by the Corps' adoption of NWP 56, including impacts from the permitted facilities' *operation*, regardless of what agency or entity is responsible for those actions.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

236.    The Decision Document also fails to adequately discuss and evaluate the cumulative impacts of permitting industrial finfish aquaculture nationwide. The Decision Document did not fully assess the incremental impact of permitting this new industry, combined with the existing and foreseeable impacts from other human activities in federal ocean waters, including climate change. While vaguely admitting and listing general impacts of industrial finfish aquaculture to the environment, the Corps refused to engage in a detailed assessment of industrial aquaculture's harms in the EEZ due to (1) The Corps' lack of authority to permit the facilities' operation and (2) the discretion of district engineers to attach unknown conditions to mitigate any impacts. This ignores the evidence before the agency that industrial finfish aquaculture will significantly impact the environment.

237.    For the above reasons, the Corps violated NEPA, and the FONSI is invalid because the Corps failed to take a hard look at the direct, indirect, and cumulative effects arising from the industrial finfish aquaculture that NWP 56 authorizes and failed to prepare an EIS. By issuing a FONSI that fails to meet the standards laid out in NEPA, its implementing regulations, and governing precedent, the Corps has acted in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA. 5 U.S.C. §§ 701-706.

238.    The actions and inactions of the Defendants described in this Claim for Relief are causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1
2

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF ESA:

3
4

FAILURE TO ENSURE AGAINST JEOPARDY THROUGH ESA CONSULTATION

5

239.   Plaintiffs re-allege and incorporate by reference the allegations set forth

6

in Paragraphs 1-238 in the Complaint as if fully set forth herein.

7
8

240.   Section 7(a)(2) of the ESA prohibits agency actions that jeopardize the

9

survival of listed species, or that destroy, or adversely modify their critical habitat.

10

16 U.S.C. § 1536(a)(2).

11

241.   An agency must engage in consultation with the Services for every

12

agency action—including "all activities or *programs* of any kind authorized, funded,

13

or carried out," by an agency, 50 C.F.R. § 402.02 (emphasis added)—that "may

14

affect" a federally listed species or critical habitat in any manner. *Id.* § 402.14(a), (c),

15

(g); *see also* 80 Fed. Reg. 26,832, 26,835 (May 11, 2015) (programmatic consultation

16

"allows for a broad-scale examination" of federal programs that is "not as readily

17

conducted" through subsequent project-specific consultation).

18

242.   NWP 56 constitutes both a "permit"— requiring project-specific

19

consultation when used for individual projects that "may affect" listed species—*and*

20

a "program" (i.e., a nationwide scheme for RHA compliance) requiring ESA review at

21

the programmatic level when issued by the Corps. *See* 84 Fed. Reg. at 44,997

22

(stating the ESA "still requires a programmatic consultation to meet the

23

requirements of section 7(a)(2)[,]" even if "specific projects … developed in the future

24

… are subject to site-specific stepped-down, or tiered consultations where incidental

25

take is addressed"); *see also* 80 Fed. Reg. at 26,835 ("[A] second consultation and an

26

action-specific incidental take statement still need to be provided when later actions

27

are authorized under the program."); 80 Fed. Reg. at 26,836 (preamble to the

Service's 2015 regulations stating that "[t]he Services can legitimately draw a

distinction between 'effects' of the program and the purpose of a biological opinion on

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

that program and 'take' and the purpose of an incidental take statement in the subsequent consultation on later actions carried out under the program"); 80 Fed. Reg. at 26,836 (programmatic consultations enable the Services "to determine whether a program and its set of measures intended to minimize impacts or conserve listed species are adequately protective").

243.    NWP 56 and the actions it authorizes are likely to affect species listed under the ESA. When taken together with baseline conditions and impacts of other ongoing and foreseeable activities, the harms caused by the authorization of NWP 56 easily meet the low threshold set by the ESA that NWP 56 "may affect" the continued existence of ESA-listed species or adversely modify critical habitat.

244.    The Corps did not adequately consider likely impacts of NWP 56 on threatened and endangered species in making an erroneous and unlawful "no effect" determination and concluding that its authorization of NWP 56 did not require programmatic ESA consultation. Indeed, the Corps' reliance on project-specific reviews to avoid programmatic consultation is inconsistent with the Services' own implementing regulations. *See* 50 C.F.R. § 402.14(c). In so doing, the Corps failed to ensure that NWP 56 will not jeopardize the continued existence of listed species or adversely modify designated critical habitat.

245.    The actions and inactions of the Defendants described in this Claim for Relief are causing injuries to Plaintiffs, for which they have no adequate remedy at law.

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1
2

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF MSA:

3

FAILURE TO CONSULT ON ESSENTIAL FISH HABITAT REGARDING
AUTHORIZATION OF NWP 56

4

246.    Plaintiffs re-allege and incorporate by reference the allegations set

5

forth in Paragraphs 1-245 in the Complaint as if fully set forth herein.

6

247.    The MSA requires consultation with NMFS on any action which may

7

adversely affect EFH. 16 U.S.C. § 1855(b)(2). An "adverse effect" is any impact that

8

reduces the quality and/or quantity of EFH, and may include direct (e.g.,

9

contamination or physical disruption), indirect (e.g., loss of prey or reduction in

10

species fecundity), site-specific or habitat-wide impacts, including individual,

11

cumulative, or synergistic consequences of actions. 50 C.F.R. § 600.810.

12

248.    The MSA requires consultation with NMFS on *all* actions, including

13

proposed actions, which may adversely affect EFH. 16 U.S.C. § 1855(b)(2). When

14

NMFS is consulted on impacts to EFH under this Act, it must "recommend to such

15

agency measures that can be taken by such agency to conserve such habitat[,]" and

16

should the action agency fail to adopt those measures it must explain its reasons for

17

not following those measures. *Id.* § 1855(b)(4)(A).

18

249.    The Corps has erroneously and unlawfully determined that the NWP

19

program does not require programmatic consultation on EFH. Again, the Corps'

20

reliance on project-specific reviews to avoid programmatic consultation fails to take

21

into account its action as a whole. The Corps' determination is arbitrary, capricious,

22

an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

23

250.    The actions and inactions of the Corps described in this Claim for Relief

24

are causing injuries to Plaintiffs, for which they have no adequate remedy at law

25
26
27

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1

## PRAYERS FOR RELIEF

2    WHEREFORE, the Plaintiffs respectfully request that the Court:

3        1.    Adjudge and declare NWP 56 as an unlawful *ultra vires* agency action,

4            outside Defendants' authority under the RHA, the OCSLA, and the

5            Property Clause of the Constitution;

6        2.    Adjudge and declare that the Corps' decision to authorize NWP 56, as

7            well as the Decision Document and FONSI issued by the Corps in

8            connection with that approval, are in violation of the RHA, NEPA, ESA,

9            MSA, and APA;

10       3.    Adjudge and declare that the Corps violated NEPA and the APA by

11           failing to prepare an EIS prior to authorizing NWP 56;

12       4.    Adjudge and declare that the Corps violated the RHA's implementing

13           regulations when it adopted NWP 56 without adequately supporting its

14           determination that it would not cause more than minimal cumulative

15           adverse impacts or the effectiveness of its mitigation measures;

16       5.    Adjudge and declare that the Corps violated the ESA and its

17           implementing regulations when it adopted NWP 56 without completing

18           consultation under Section 7 of the ESA;

19       6.    Adjudge and declare that the Corps violated the MSA and its

20           implementing regulations when it authorized NWP 56 without

21           completing programmatic consultation on EFH under the MSA;

22       7.    Vacate and set aside the Corps' decision to authorize NWP 56, and

23           declare that the Corps must comply with all requirements of NEPA, the

24           RHA, the ESA, the MSA, and the APA, including preparing an EIS and

25           completing programmatic consultation under the ESA and MSA if the

26           agency proposes to reauthorize NWP 56;

27       8.    Award the Plaintiffs their fees, costs, expenses, and disbursements,

COMPLAINT – 87
Case No. 22-1627

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770

1       including reasonable attorneys' fees, associated with this litigation

2       under the Equal Access to Justice Act, 28 U.S.C. § 2412 and the ESA,

3       16 U.S.C.§ 1540; and

4       9.    Grant such other relief as this Court deems just and proper.

6       DATED: November 14, 2022       Respectfully Submitted,

8       */s/ George Kimbrell*

9       George A. Kimbrell (WSB No. 36050)
        Jennifer Loda (*pro hac vice*)

10      Meredith Stevenson (*pro hac vice*)
        Center for Food Safety

11      303 Sacramento Street, 2F
        San Francisco, CA 94111

12      T: (415) 826-2770

13      gkimbrell@centerforfoodsafety.org
        jloda@centerforfoodsafety.org

14      mstevenson@centerforfoodsafety.org

15      *Counsel for all Plaintiffs*

16

17      Marianne Cufone
        Recirculating Farms Coalition (*pro hac vice*)

18      5208 Magazine St., #191
        New Orleans, LA 70115

19      T: (813) 785-8386
        mcufone@recirculatingfarms.org

21      *Counsel for Plaintiffs Recirculating Farms*
        *Coalition and Don't Cage Our Oceans*

Center for Food Safety
303 Sacramento St., 2nd Floor
San Francisco, CA 94115
(415) 826-2770