1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DON'T CAGE OUR OCEANS, et al., | CASE NO. C22-1627-KKE |
| Plaintiff(s), | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | |
| Defendant(s). | |

The parties' cross-motions for summary judgment in this action require the Court to review Nationwide Permit ("NWP") 56, issued by Defendant United States Army Corps of Engineers ("the Corps") to authorize the installation of structures to be used in finfish aquaculture operations in United States waters. The Court's review of NWP 56 indicates that the Corps issued the permit without fully complying with the procedural safeguards imposed by the Rivers and Harbors Act of 1899 ("RHA") and the National Environmental Policy Act ("NEPA"). The Court therefore finds that the Corps violated the Administrative Procedure Act ("APA"), and Plaintiffs' motion is granted in that respect. The Court finds, however, that Defendants are entitled to summary judgment on Plaintiffs' claims asserting that Defendants acted outside of their authority in issuing NWP 56. Although the Court concludes NWP 56 is unlawful, more information is needed before the Court can determine the appropriate remedy, as explained herein.

## I.   BACKGROUND

In May 2020, President Trump issued an executive order titled "Promoting American Seafood Competitiveness and Economic Growth."  Exec. Order No. 13,921, 85 Fed. Reg. 28,471 (May 7, 2020).  This order required that, among other things, within 90 days the Secretary of the Army develop and propose for public comment an NWP authorizing finfish aquaculture activities in United States waters.  *Id*. at 28,473–74.

The Corps narrowed the scope of the proposed NWP to authorize only the structures to be used in finfish aquaculture activities rather than the activities themselves (NWP002440[1]), and with that limitation applied, the Corps found that the permit would cause no more than "minimal" environmental impacts and was therefore suitable to be issued as a general permit.  NWP002436– NWP002519.  The Corps' decision document contains an environmental assessment ("EA") concluding that the NWP would cause no significant impact to the quality of the human environment, and that as a result of that finding, a full environmental impact statement ("EIS") was not needed.  NWP002518.  The Corps' review also determined that the activities permitted under this NWP would not impact any species listed in the Endangered Species Act ("ESA"), and thus the Corps found it was not required by the ESA to consult with other federal agencies before issuing the permit.  *See* NWP002514–NW002518.

NWP 56 was issued in January 2021, and Plaintiffs (a collection of nonprofit and other organizations) filed this action against the Corps and its lieutenant general (referred to collectively herein as "the Corps") in November 2022 to challenge NWP 56 and request its vacatur.  Dkt. No. 1.  Plaintiffs amended their complaint in January 2023.  Dkt. No. 14.  After the administrative

---

[1] This order cites the administrative record (Dkt. Nos. 28, 33) using the page numbers in the bottom-right corner.

record was filed, the parties cross-moved for summary judgment.  Dkt. Nos. 28, 44, 62.[2]  The Court heard oral argument on those cross-motions in July 2024 (Dkt. No. 68), and the motions are now ripe for resolution.

## II.   ANALYSIS

Plaintiffs challenge NWP 56 on a number of bases.  Dkt. No. 44.  The Corps opposes Plaintiffs' motion on each basis asserted, and also argues that Plaintiffs lack standing to challenge NWP 56 in the first place.  Dkt. No. 62.  The Court will first address the standing issue, and then turn to consider the merits of the parties' arguments regarding NWP 56.

### A.      Legal Standards on Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court does not make credibility determinations or weigh the evidence at this stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

### B.      Plaintiffs Have Standing to Challenge NWP 56.

In order to establish standing to sue under Article III of the Constitution, a plaintiff must establish that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The injury must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id*. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

---

[2] This order cites the parties' briefing using CM/ECF page numbers.

An organizational plaintiff must demonstrate that at least one of its "members would otherwise have standing to sue in [the member's] own right, [that] the interests at stake are germane to the organization's purpose, and [that] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000)). A "generalized harm to … the environment will not alone support standing[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Plaintiffs must instead demonstrate imminent individualized harm to their recreational or aesthetic use of an area. *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972). The Ninth Circuit considers a plaintiff to have shown imminent injury resulting from an agency's programmatic action if the plaintiff identifies a concrete interest that is affected by the agency action, even if the potential injury is merely threatened and is contingent on additional actions.[3] *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1515–16 (9th Cir. 1992).

Here, Plaintiffs' motion for summary judgment addresses standing in a footnote:

> Plaintiff member organizations and their members have standing because their members' professional, cultural, recreational, aesthetic, economic, and personal interests in aquatic and wildlife resources, including federally protected species, are injured and will continue to be injured, by the Corps' *ultra vires* authorization of NWP 56 and failure to adequately analyze and take into account NWP 56's adverse impacts under numerous environmental statutes.

Dkt. No. 44 at 22–23 n.4 (citing the declarations filed in support of Plaintiffs' motion).

The Corps contends that this footnote and the declarations cited therein are insufficient to establish that Plaintiffs have standing to challenge NWP 56. Dkt. No. 62 at 21. Specifically, the Corps cites the declarations' generalized statements of harm resulting from hypothetical activities

---

[3] Here, the parties agree that any aquaculture facility authorized under NWP 56 requires a pre-construction notice, but do not agree whether the Corps' decisions on those notices are subject to judicial review. *See, e.g.*, Dkt. No. 70 at 13–23. The Court need not determine whether NWP 56 could be challenged on a site-specific level because, as explained herein, the Court finds that Plaintiffs have standing to challenge NWP 56 on a programmatic level.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 4

conducted at structures not yet authorized by NWP 56, arguing that such speculative concerns do not rise to the level needed to confer standing. *Id*. at 21–22. The Corps also contends that Plaintiffs' members' speculative concerns relate to finfish aquaculture activities in general, but not to specific structures authorized by NWP 56. *Id*. at 22. Furthermore, the Corps argues that vacating NWP 56 would not eliminate finfish aquaculture activities altogether, given that activities have been permitted for years (via individual permit) before NWP 56 was issued. *Id*. at 22–23. Thus, according to the Corps, Plaintiffs have failed to establish any of the injury in fact, traceability, and redressability prongs necessary to confer standing.

The Court disagrees with the Corps and finds that Plaintiffs have submitted evidence sufficiently establishing all three requirements for standing. First, Plaintiffs assert that the Corps issued NWP 56 without fully complying with procedural requirements intended to protect their environmental interests in specific locations. *See* Dkt. No. 63 at 15–16. Plaintiffs' members live, work, travel, and/or recreate in areas identified as "Aquaculture Opportunity Areas," which were "evaluated for their potential for sustainable commercial aquaculture" and defined by the executive order that led to the creation of NWP 56. *See* Dkt. No. 45-1 at 3; Dkt. No. 46 ¶¶ 6–10; Dkt. No. 47 at 6–7, 15, 17–18, 21; Dkt. No. 49 at 3–4, 10; Dkt. No. 51 at 14; Dkt. No. 53 at 6. Plaintiffs' members have specifically described an imminent harm to their use of specific geographical areas likely to be impacted by activities authorized under NWP 56. *See* Dkt. No. 45-1 at 3; Dkt. No. 46 ¶¶ 6–10; Dkt. No. 47 at 6–7, 15, 17–18, 21; Dkt. No. 49 at 3–4, 10; Dkt. No. 51 at 14; Dkt. No. 53 at 6. Plaintiffs have shown that projects authorized under NWP 56 would impede their interests in those geographical areas due to, for example, the resulting degradation of water quality and disease transfer from farmed fish to wild fish. *Id*. Plaintiffs have therefore sufficiently established an injury in fact. *See Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018) (explaining that plaintiffs demonstrate "an injury in fact in the context of a

claimed procedural error in an agency's decisionmaking process" by showing that the agency violated a procedural rule that protects their concrete interests, and that it is "'reasonably probable that the challenged action will threaten their concrete interests'" (quoting *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017)).

Because Plaintiffs have asserted a procedural injury, the second two causation requirements (traceability and redressability) for Article III standing are relaxed.  *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).  Under this relaxed standard, a plaintiff must show that "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision."  *Friends of Santa Clara River*, 887 F.3d at 918 (quoting *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1156 (9th Cir. 2015)).  Plaintiffs have satisfied these elements because they have asserted that as a result of the Corps' failure to fully assess the foreseeable cumulative effects of NWP 56, the Corps concluded its review prematurely, and did not go on to conduct a full EIS or consult with other agencies under the ESA.  Dkt. No. 63 at 25–39.  Because compliance with procedural requirements could lead the Corps to, for example, modify the terms of NWP 56, engage in ESA consultation, or to conclude that aquaculture activities are not suitable for authorization on a nationwide basis, Plaintiffs have shown that their injury is traceable to NWP 56 and redressable by correction of the procedural error.  *See, e.g.*, *Friends of Santa Clara River*, 887 F.3d at 919–20.

Accordingly, the Court finds that Plaintiffs have standing to bring a procedural challenge to NWP 56.

## C.    The Corps Inadequately Assessed NWP 56's Impacts.

### 1.    *The Corps Is Obligated to Consider the Impacts of Its Actions.*

The Corps issues permits under several statutory authorities, including Section 10 of the RHA (33 U.S.C. § 403).  The Corps is a "highly decentralized organization" that delegates most

of the authority for administering its regulatory programs to engineers at the regional division and local district level. *See* 33 C.F.R. §§ 320.1(a)(2), 325.8(b)–(c). "Reducing unnecessary paperwork and delays is a continuing Corps goal." *Id.* § 320.1(a)(4).

Because the Corps receives a number of Section 10 permit applications each year, it relies on general permits such as NWPs to manage its regulatory docket and focus its limited resources on projects that may cause more than minimal impacts. *See* 33 C.F.R. § 322.2(f). NWPs are "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b). NWPs set forth the specific terms and conditions that must be followed in order to obtain authorization for activities under that permit. *See, e.g.*, *id.* §§ 330.1(c), 330.2(h).

In order to determine which projects are suitable for authorization on a general level via nationwide permit, the Corps' chief of engineers must conduct a predictive environmental analysis at the national level to determine whether the category of activities authorized by a proposed permit will be "substantially similar in nature and cause only minimal individual or cumulative environmental impacts" over the permit's five-year duration. 33 C.F.R. §§ 322.2(f)(1), 330.5(b). A determination that a proposed project will have "minimal impacts" must comply with the Corps' regulations, which require the Corps to consider certain public interest factors. *See id.* § 320.4(a). Specifically, Corps regulations provide that "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* § 320.4(a)(1). The public interest review process also addresses mitigation measures needed to avoid, minimize, rectify, reduce, or compensate for resource losses resulting from authorized projects. *Id.* § 320.4(r).

In addition to the Corps' obligation to analyze the impacts of a Section 10 nationwide permit before issuance, NEPA also requires federal agencies, including the Corps, "to analyze the environmental impact of their proposals and actions." *Coal. to Protect Puget Sound Habitat v.*

*U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354, 1357 (W.D. Wash. 2019) (quoting *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007)).   Federal agencies must first complete an EA of their proposed actions.  *See* 40 C.F.R. § 1501.5.  If they cannot state in an EA that their proposed action will not have significant effects then they must go on to prepare a more detailed, comprehensive EIS.  *See* 40 C.F.R. § 1501.6.

A court may set aside an agency action under the APA if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  This standard is deferential, and courts should uphold an agency's decision

> unless the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of Santa Clara River*, 887 F.3d at 920–21 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).

2. *The Corps Narrowed Its Assessment of NWP 56 Impacts to Focus on Aquaculture Structures While Discounting Significant Potential Adverse Impacts from Aquaculture Activities.*

In this case, Plaintiffs contend that the Corps did not fully comply with its obligations under either the RHA or NEPA when it found that NWP 56 would have "no more than minimal individual and adverse effects" or "will not have a significant impact" (NWP002518–NWP002519) for two reasons.  First, Plaintiffs argue that the Corps narrowed the scope of its review to assessing impacts resulting from the aquaculture *structures* rather than the uses of the structures for aquaculture *activities*, in contravention of its obligation to evaluate the impacts "of the proposed activity *and its intended use* on the public interest" (33 C.F.R. § 320.4(a)(1)).  Dkt. No. 44 at 18–19.  Second, Plaintiffs allege that the Corps claimed it was too difficult to predict the cumulative impacts of NWP 56 before its issuance, without knowing how and how often it would

be invoked, and thus improperly instructed the district engineers to assess cumulative impacts and mitigation measures on a project-by-project basis in the future. *Id*. at 31–34. Plaintiffs argue that for both of these reasons, the Corps did not fully comply with the procedural safeguards imposed on it via the RHA and NEPA and therefore violated the APA when it issued NWP 56. The Court turns to consider the scope of the Corps' impact analysis, to determine whether it properly considered the cumulative impact of NWP 56.

Here, NWP 56's decision document contains, among other things, the EA and the determinations made under the RHA and NEPA of the impacts expected to result from NWP 56. NWP002436–NWP002519. In that document, the Corps notes that the cumulative impacts of NWP 56 "are the product of how many times this NWP is used to authorize structures in the navigable waters of the United States … across the country during the 5-year period this NWP is anticipated to be in effect." NWP002477; *see also* NWP002486 (estimating that NWP 56 will be "used approximately 5 times per year on a national basis"). The Corps cautiously explains that because NWP 56 may be invoked in a variety of settings, "it is difficult to predict all of the direct and indirect impacts that may be associated with each activity authorized by an NWP." NWP002477. In light of this uncertainty, the Corps decided to "require pre-construction notification for certain activities to provide district engineers the opportunity to review proposed activities on a case-by-case basis and determine whether they will result in no more than minimal individual and cumulative adverse environmental effects." NWP002477–NWP002478. The Corps contemplated that when a division or district engineer assesses a pre-construction notice and determines that the cumulative adverse environmental effects of the proposed activity will be more than minimal, the engineer may impose additional conditions and "will compile information on the cumulative adverse effects and supplement the information in this [decision document]." NWP002478; *see also* NWP002485 (explaining factors that a division or district engineer should

consider in determining whether a proposed activity will cause more than minimal individual and cumulative adverse impacts).

In the section of the decision document detailing the Corps' "Impact Analysis," the Corps acknowledges that NWP 56 authorizes the installation of structures in the navigable waters of the United States, and that after those structures are installed, "there will be environmental impacts that are caused by the operation of the finfish mariculture facility that was authorized by this NWP." NWP002481. The decision document identifies and discusses a list of potential impacts, such as the cultivation of non-native species at these facilities; the application of antibiotics, therapeutics, pesticides, and other chemicals; the release of unconsumed finfish food into the surrounding waters; and the release of waste products, such as finfish feces and urine, into the surrounding waters. *Id*. The Corps explains that although it does not dispute that these impacts have a "but for" causal relationship with the activities authorized by NWP 56 (*i.e.*, the installation of aquaculture facilities), because the Corps "does not have the authority to prevent or control" these operational activities, the Corps need not conduct a "detailed analysis" of the operational activities in its impact analysis. *Id*. Nonetheless, in the section of the decision document addressing the 20 public interest factors listed in 33 C.F.R. § 320.4(a)(1), the Corps explained that it expected the impacts of NWP 56 as to many of those factors to be adverse to some degree, and in some cases substantially adverse. *See* NWP002492–NWP002512.

Specifically, the Corps acknowledges that the multi-trophic mariculture activities[4] conducted in structures authorized by NWP 56, which may result in the accidental but unpreventable escape of cultivated finfish with wild fish, "have the potential for adverse effects." NWP002493; *see also* NWP002494 (detailing some of the potential adverse effects of cultivated

---

[4] This term refers to the cultivation of finfish "along with the cultivation of seaweeds and/or bivalve molluscs[.]" NWP002513.

fish escapes).  The Corps also noted that if non-native finfish species are cultivated in the structures authorized by NWP 56, that cultivation "should be considered a high risk activity that could potentially have substantial adverse ecological and socioeconomic outcomes[.]"  NWP002494. Yet, the Corps emphasized that it "does not have the authority to regulate the handling of cultivated finfish that might potentially result in escapes," nor does it "have the authority to control the species of finfish cultivated in the structures constructed for finfish mariculture activities."  *Id*.

The Corps also acknowledged that antibiotics and other products may be used to control pathogens or disease in the cultivated fish, and that these substances may be released into habitats and sediment (NWP002500), but again emphasized that the Corps "does not have the authority to control the use of antibiotics, therapeutics, and other chemicals that may be used for finfish mariculture operations to produce healthy finfish[,]" nor does it "have the authority to regulate potential pathogen transfers between cultivated finfish and wild finfish stocks."  NWP002495.

Later in the document, the Corps acknowledged that the *use* of the structures authorized by NWP 56 may adversely affect water quality, but emphasized that these adverse effects "are unlikely to be caused by the installation of finfish mariculture facilities that is authorized by this NWP[.]"  NWP002508.  Again, the Corps also emphasized that it "does not have authority to regulate most operational aspects of finfish mariculture activities [that would impact water quality], such as feeding, control of nuisance or fouling organisms, or discharges of animal waste." NWP002510.

The decision document for NWP 56 concludes with the Corps' determination that "the structures in navigable waters of the United States, including federal waters on the outer continental shelf, for finfish mariculture activities and multi-trophic mariculture activities authorized by the issuance of this NWP will not have a significant impact on the quality of the human environment."  NWP002518 (finding that in light of that determination, no EIS is required

before the NWP can be issued).  The Corps also found that the issuance of NWP 56 "is not contrary to the public interest" and that the structures authorized by NWP 56 "will have no more than minimal individual and cumulative adverse effects on the aquatic environment during the 5-year period this NWP is in effect."  NWP002519.

### 3.  The Corps' Impacts Assessment Is Inadequate under the RHA and NEPA.

The Court agrees with Plaintiffs that the limitations and caveats inherent in the Corps' analysis of NWP 56's impact are inconsistent with applicable regulations and with cases from this district and others in the Ninth Circuit, as well as the purpose of environmental review.  *See, e.g.*, 40 C.F.R. § 1500.1(a) (2020) (explaining that "NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action").

First, the Corps' NWP 56 decision document acknowledges its obligation to consider the cumulative effects of the permitted activities (*see* 33 C.F.R. § 320.4(a)(1)), and that cumulative impacts or effects have been "defined in various ways."  NWP002476.[5]  Under regulations in place at the time NWP 56 was issued, an agency is tasked with considering the effects of its actions, meaning

> changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

---

[5] Until the September 2020 regulatory amendments, NEPA regulations defined "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from actions with individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7 (pre-September 13, 2020 version).  That definition was repealed, but a similar definition was reinserted in the regulations in May 2022.  *See id.* § 1508.1(i)(3) ("Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative effects can result from actions with individually minor but collectively significant effects taking place over a period of time.").  For an explanation as to the intent of these changes, see Update to the Regulations Implementing the Procedural Provisions of NEPA, 85 Fed. Reg. 43,304 (July 16, 2020); NEPA Implementing Regulations Revisions, 87 Fed. Reg. 23453-01 (Apr. 20, 2022).

40 C.F.R. § 1508.1(g) (version implemented in 2020).  The agency is not "responsible … under NEPA" for even "but for" effects caused by its actions if the "effects" "are remote in time, geographically remote, or the product of a lengthy causal chain.  Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."  *Id*. § 1508.1(g)(2) (2020).

Here, the effects of the aquaculture activities are not remote in time, geographically remote, or the product of a lengthy causal chain: they will result from essentially any of the intended uses of structures authorized by NWP 56, as the EA itself acknowledges.  *See, e.g.*, NWP002480 ("After the structures authorized by this NWP are completed, the operation of the finfish mariculture activity will likely involve activities that do not require [Corps] authorization, such as the addition or removal of finfish from the cages or net pens, feeding activities, the administration of antibiotics and other therapeutics to keep the cultivated finfish healthy, the use of chemicals to control sea lice and other parasites, and the use of antifouling agents.")  Moreover, the effects are not outside the Corps' ability to prevent, because the Corps is the agency authorizing the installation of the aquaculture facilities in the first place.  *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213–17 (9th Cir. 2008) (citing *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1994) ("The Forest Service says that cumulative impacts from non-Federal actions need not be analyzed because the Federal government cannot control them. That interpretation is inconsistent with 40 C.F.R. § 1508.7, which specifically requires such analysis.")).

Because, as acknowledged in the Corps' EA, environmental impacts will occur as direct and immediate results of the intended use of facilities permitted under NWP 56, the Corps may not distance itself from those impacts because the aquaculture activities themselves are not authorized by NWP 56.  Although the Corps contends that it "considered certain impacts caused by operational activities" (Dkt. No. 65 at 25), and therefore did not overly narrow the scope of

analysis in its EA, that the Corps *acknowledged* impacts does not establish that it explained how it *accounted* for those impacts when determining that the impacts were minimal or insignificant. The Corps emphasized its lack of ability to control or regulate the many adverse impacts identified in the EA, but this segmented approach is not consistent with the purpose of environmental review.

As explained in *Coalition,* even where the Corps lacks the authority or jurisdiction to authorize or prohibit operational activities, the Corps cannot ignore the foreseeable uses of the facilities it permits.  *See* 417 F. Supp. 3d at 1364.  In *Coalition*, the Corps reissued a nationwide permit authorizing the installation of, among other things, shellfish aquaculture facilities and the discharging of material necessary for shellfish cultivation.  *Id*. at 1357.  In its EA, the Corps acknowledged that pesticides would be discharged as a result of shellfish cultivation, but declined to consider the impact of the pesticides because "they are regulated by some other entity."  *Id*. at 1364.  The court found that the Corps could not simply "ignore the foreseeable uses and impacts of pesticides in the activities it permitted on a nationwide basis[.]"  *Id*.  "Having eschewed any attempt to describe the uses of pesticides in commercial shellfish aquaculture or to analyze their likely environmental impacts, the decision to permit such activities through NWP 48 cannot stand."  *Id*.  The *Coalition* court's reasoning was affirmed on appeal by the Ninth Circuit.  843 F. App'x 77, 79 (9th Cir. 2021) (finding that the Corps did not comply with its obligation to consider the impacts of reasonably foreseeable future actions, because "the Corps responded to a concern about pesticides with the irrelevant explanation that the Corps does not regulate pesticides").

Although in this case, the Corps contends that it did not ignore the impact of aquaculture operations when conducting its environmental review because it referenced those impacts throughout the EA, the Court is not convinced that simply disclosing the impacts is sufficient.  A list of potential adverse impacts does not necessarily support the Corps' conclusion that those impacts are nonetheless minimal.  *See, e.g.*, NWP002492–NWP002511 (describing adverse

impacts that could result to conservation, general environmental concerns, wetlands, fish and wildlife values, recreational activities, and water quality).   The Corps' decision document acknowledges the numerous, and in one case "high risk" (NWP002494), potential adverse impacts of NWP 56, yet generally attempts to avoid the brunt of those impacts by emphasizing its lack of ability to control the use of the structures it permits under NWP 56.

The Corps contends that because NWP 56 does not authorize the *operation* of the structures permitted, it could "reasonably decide to focus primarily on the impacts of the structures themselves."  Dkt. No. 62 at 40 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767–70 (2004)).  *Public Citizen* is distinguishable, however.  In that case, the President lifted a moratorium on the cross-border operation of Mexican motor carriers in the United States, subject to the preparation of new safety regulations applicable to Mexican motor carriers.  541 U.S. at 762.  The Federal Motor Carrier Safety Administration ("FMCSA") conducted an EA associated with the proposed safety regulations, which indicated that because the entry of Mexican motor carriers to the United States was the result of the President's lifting the moratorium (and not the result of the new safety regulations), FMCSA was not required by NEPA to "consider any environmental impact that might be caused by the increased presence of Mexican trucks within the United States." *Id*. at 761.  Although the adequacy of the EA was challenged on the grounds that it ignored "but for" causes of the proposed agency action, the Supreme Court found no error in FMCSA's EA on this ground: "Since FMCSA has no ability categorically to prevent the cross-border operations of Mexican motor carriers, the environmental impact of the cross-border operations would have no effect on FMCSA's decisionmaking—FMCSA simply lacks the power to act on whatever information might be contained in the EIS." *Id*. at 768.

Although FMCSA may have lacked the ability to stop the entry of Mexican trucks in the United States due to actions of the President, here, the President explicitly instructed the Corps to

"develop and propose for public comment, as appropriate and consistent with applicable law, a proposed [] nationwide permit authorizing finfish aquaculture activities" in certain federal waters, and to "assess whether to develop a [Corps NWP] authorizing finfish aquaculture activities in other waters of the United States[.]"  *See* 85 Fed. Reg. at 28,474.  The President's executive order did not mandate that any and all finfish aquaculture activities must be allowed in all federal waters, nor did it instruct the Corps to address only structures.  The Corps was therefore not constrained, like FMCSA in *Public Citizen*, by presidential action, and it retained the ability to act on whatever information was revealed in its EA.  *Public Citizen* therefore does not support the Corps' assertion that its EA need not account for the impacts of the use of aquaculture structures when assessing the impact of NWP 56, given that using the structures is the purpose of permitting them in the first place.

And although, as the Corps cautioned, "it is difficult to predict all of the direct and indirect impacts that may be associated with each activity authorized by an NWP" (NWP002477), here, the Corps did not need to resort to divination to identify and detail a variety of potential adverse impacts resulting from the ultimate use of the structures.[6]  It nonetheless stopped short of building a logical bridge between the multiple acknowledged adverse impacts (including one described as "high risk" with potentially "substantial adverse ecological and socio-economic outcomes" (NWP002494)) and the Corps' conclusion that the impacts of NWP 56 would be no more than minimal or would be insignificant.  The lack of explanation undermines the Corps' claim that it took a "hard look" at the effects of NWP 56, and renders the Corps' EA insufficient.  *See, e.g.*, *Klamath-Siskiou Wildlands Ctr. v. Bur. of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004) (finding that an agency's "conclusory presentation" in its EA was insufficient); *Neighbors of Cuddy*

---

[6] Furthermore, NWP 56 did not allow for the creation of a new industry *ex nihilo*. As acknowledged by the Corps (Dkt. No. 62 at 12), some aquaculture facilities predate the existence of NWP 56.

1

*Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about

2

'possible' effects and 'some risk' do not constitute a 'hard look[.]'").

3

    To the extent that NWP 56 instructs division and district engineers to monitor whether the

4

use of NWP 56 would result in more than minimal adverse environmental effects (NWP002484–

5

NWP002485), *future* assessment or mitigation of the impacts of NWP 56 is insufficient to satisfy

6

the Corps' obligation to consider the cumulative effects *before* issuance.  *See, e.g.*, *Pac. Coast Fed.*

7

*of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248, 1267 (W.D. Wash.

8

2007) (explaining that when an agency defers comprehensive analysis of an agency action to future

9

site-specific consultations, that deferral "necessarily improperly curtails the discussion of

10

cumulative effects").  The Corps has failed to persuasively explain how a site-specific review—

11

one aquaculture facility at a time—could afford a division or district engineer the perspective

12

necessary to assess the cumulative effects of NWP 56.  If finfish aquaculture activities are so varied

13

and difficult to assess ahead of time and in the abstract, perhaps these activities are not amenable

14

to authorization via a nationwide permit.  *See, e.g.*, *Coalition*, 417 F. Supp. 3d at 1367 (noting that

15

the Corps' decision to address "all commercial shellfish aquaculture activities in the United States

16

… in a single nationwide permit" "made assessing the impacts of disparate operations difficult:

17

the Corps essentially acknowledges that the permitted activity is performed in such different ways

18

and in such varying ecosystems that evaluating impacts on a nationwide level is nearly

19

impossible").

20

    Moreover, although NWP 56 requires project proponents to file a pre-construction notice

21

to inform division and district engineers of an intent to install a structure under NWP 56, if the

22

division or district engineer does not respond within 45 days, the project is automatically

23

24

authorized.  *See* NWP002444.[7]  That the additional layer of review at the pre-construction notice stage need not occur undermines the Corps' effort to suggest that this layer works in concert with its initial pre-issuance review to assure that the cumulative effects of NWP 56 are no more than minimal or not significant.

For all of these reasons, because the Corps narrowed its EA to disclose but not account for many foreseeable effects of NWP 56, its findings of minimal effects and no significant impacts are insufficiently supported and explained.  NWP 56 therefore fails to comply with the Corps' procedural obligations under the RHA and NEPA and it is unlawful.[8]

**D.**   **The Corps Did Not Act Outside the Scope of Its Authority in Issuing NWP 56.**

Two of Plaintiffs' claims allege that the Corps acted outside the scope of its authority in issuing NWP 56.  *See* Dkt. No. 14 at 79–83 (first and second claims listed in amended complaint).  The Court will address each in turn.

*1.   The Corps Did Not Exceed Its Authority under OCSLA in Issuing NWP 56.*

Section 10 of the RHA requires that a party obtain a permit from the Corps to engage in any activity that affects the navigable capacity of United States waterways. 33 U.S.C. § 403.  The purpose of Section 10 "is to prevent obstruction of the navigable capacity of the United States' waterways."  *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir. 1983).  NWP 56 provides

---

[7] There is an exception to this automatic authorization for notices where the applicant has informed the Corps that the proposed project would affect or is located near an ESA-listed species or designated critical habitat.  *See* NWP002444.

[8] Although Plaintiffs challenged NWP 56 on a number of grounds, because the Court finds NWP 56 deficient in these respects, it need not address whether it is deficient in the other respects as well.  Specifically, because the Corps' failed to explain how it accounts for many of the impacts it identifies and acknowledges, the Court cannot determine whether if those impacts had been fully accounted for in the decision document, a full EIS or consultation under the ESA would have been required.  But to the extent the Corps argues that consultation under the ESA is unnecessary because NWP 56's general condition 18 obligates permit applicants to identify any impact on listed species in their pre-construction notices, the Court shares Plaintiffs' concern that applicants are neither motivated nor qualified to fulfill the Corps' obligation under the ESA.  *See* Dkt. No. 44 at 39–42.

authorization under Section 10 to install structures in navigable waters of the United States.  *See* NWP002436.

Plaintiffs contend that the Corps lacked the authority to authorize the installation of structures that will be anchored to the seabed of the outer continental shelf for aquaculture purposes, citing the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–56c. Plaintiffs argue that OCSLA limits the Corps' Section 10 permitting authority to structures related to energy resources.  Dkt. No. 44 at 25.  Because NWP 56 authorizes permits for non-energy-related installations, Plaintiffs contend that NWP 56 constitutes *ultra vires* agency action.  *Id*. at 24–26.

"The Supreme Court has explained that 'the purpose of OCSLA was to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and subsoil of the outer Continental Shelf, and to provide for the development of its vast mineral resources.'" *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 752 (9th Cir. 2022) (quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n.7 (1981)).  To that end, OCSLA states: "The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to the artificial islands, installations, and other devices referred to in subsection (a)."  43 U.S.C. § 1333(e).  Subsection (a) indicates that the United States' jurisdiction extends to

(i)     the subsoil and seabed of the outer Continental Shelf;
(ii)    all artificial islands on the outer Continental Shelf;
(iii)   installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources, including non-mineral energy resources; or
(iv)    any such installation or other device (other than a ship or vessel) for the purpose of transporting or transmitting such resources.

*Id.* § 1333(a)(1)(A).  When subsections (a) and (e) are read together, they indicate that the Corps has authority to prevent obstruction caused by installations erected for exploring, developing, and producing "resources," which is a term not defined in OCSLA.  *See id.* § 1331 (definitions).

Other terms used in Section 1331(a) are defined, however: "exploration," "development," and "production" are defined with reference to mineral extraction.  *See* 43 U.S.C. § 1331(k), (l), (m).  Thus, Plaintiffs urge the Court to rely on these definitions to read OCSLA as limiting the Corps' authority to permit only those installations that are related to energy (mineral or non-mineral) resources.  Dkt. No. 44 at 24–26.

The Corps contends (Dkt. No. 62 at 23–24) that this reading is inconsistent with the legislative history of the 1978 amendments to OCSLA, which has been found by the First Circuit to "reveal[], with exceptional clarity, Congress's intent that Section 10 authority under OCSLA not be restricted to structures related to mineral extraction." *All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 109 (1st Cir. 2005).  The *Alliance* court concluded that although it found the text of OCSLA itself to be ambiguous as to whether the extent of the Corps' Section 10 authority applied to all structures installed on the seabed regardless of purpose, legislative intent could be clearly determined by review of the legislative history of the 1978 OSCLA amendments.  398 F.3d at 109–10 (finding that the Corps' authority under OCSLA "applies to all artificial islands and fixed structures on the outer Continental Shelf, whether or not they are erected for the purpose of exploring for, developing, removing, and transporting resources therefrom[,]" and therefore is not limited to structures related to the extraction of energy resources (quoting H.R. Conf. Rep. No. 95–1474 at 82 (1978))).

The Court finds the *Alliance* reasoning persuasive, particularly because it comports with an earlier section of the same report on the 1978 amendments to OCSLA, confirming that the Corps' authority under OCSLA had previously been invoked to "regulate the construction and

location of such things as artificial fishing reefs, radio towers, and a proposed gambling casino which was to be constructed on reefs." H.R. Conf. Rep. No. 95-1474 at 81. With these facts in mind, the House conference report indicates that with the 1978 amendments, "there was no intent to change the present law" or the "existing authority of the Corps[.]" *Id*. at 82. If Congress had intended that OCSLA preclude the Corps' authority to regulate the installation of a casino—a structure certainly not built for energy-related purposes—it would not have reaffirmed that authority when amending OCSLA in 1978. Thus, *Alliance*'s interpretation of the scope of the Corps' authority is not supported only, as argued by Plaintiffs (Dkt. No. 63 at 19) on "a single sentence of legislative history" of OCSLA, but appears to conform to the approved practice of the Corps as well.

Because neither the purpose of OCSLA nor its legislative history support Plaintiffs' characterization of NWP 56 as outside the Corps' OCSLA authority, the Court rejects Plaintiffs' request to vacate NWP 56 as *ultra vires* action on this basis.

### 2. *NWP 56 Does Not Unconstitutionally Convey Property Rights.*

Plaintiffs also challenge NWP 56 on the ground that it allows structures to be installed that may not be operated without further Congressional conveyance of property rights. Dkt. No. 44 at 26–30. Plaintiffs ask the Court to find that this result is not only absurd but unconstitutional (*id*. at 24, 30), because allowing the Corps to authorize an activity that requires a property right in federal land without an act of Congress would violate the separation of powers. *See* U.S. CONST. art. IV, § 3 (providing that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States").

The Corps contends that because NWP 56 does not purport to convey any property rights and in fact explicitly disclaims any conveyance of property rights, Plaintiffs cannot show that the Corps' action violates the separation of powers. Dkt. No. 65 at 16 (citing NWP00938,

1   NWP002513).  According to the Corps, even if some projects authorized under NWP 56 would

2   require the permittees to obtain other permits or property interests in order to conduct aquaculture

3   activities, as acknowledged in the decision document itself, that additional requirement would not

4   suggest that NWP 56 itself conveys property interests in excess of the Corps' authority.  *Id.* at 17

5   (citing NWP002506, NWP002512).

6          Plaintiffs contend that the Corps' understanding of its authority is misguided: "[S]urely

7   Congress did not intend for the absurd result of [the Corps] issuing meaningless permits that cannot

8   be *used* but for a future act of Congress."  Dkt. No. 63 at 23.  The Corps disagrees: such a permit

9   may be necessary but insufficient for certain projects, rather than meaningless.  Authorization for

10  an aquaculture facility under NWP 56 would be a first step, and if additional permits (including

11  property rights) must be obtained from other sources in order to move forward on a given project,

12  that would not transform NWP 56 into a conveyance of property rights.  *See* Dkt. No. 65 at 17.

13         The Court finds the Corps' argument on this issue persuasive because it is consistent with

14  the Corps' own regulations disclaiming any authority over the adjudication of property rights (33

15  C.F.R. § 320.4(g)(6)), as well as the text of the NWP 56 decision document, which disclaims the

16  conveyance of property rights (NWP002513).  Furthermore, as noted by the Corps (Dkt. No. 62 at

17  25 n.3), Plaintiffs have provided no support for their assertion that each and every activity

18  authorized under NWP 56 would require property rights granted by Congress, given that it is not

19  clear that all aquaculture activities require a facility to be anchored to the seabed of the outer

20  continental shelf.  *See* NWP002436 (requiring that floating structures must be "securely

21  anchored").  For example, at oral argument, the Corps referenced three aquaculture facilities

22  operating under NWP 56 that are located in state waters, not located on the outer continental shelf.

23  *See* Dkt. No. 70 at 18.  NWP 56's decision document contemplates this result as well.  *See*

24  NWP002512 ("In estuarine and marine waters where the state retains title of submerged lands, the

project proponent may be required to obtain a permit, lease, or other permission or license to conduct a finfish mariculture activity.").

Because Plaintiffs have failed to show that either the Corps exceeded its authority by conveying property rights via NWP 56, or that NWP 56 is unconstitutional because it does not convey the property rights that can only be granted by Congress in order to act on a permit issued under NWP 56, the Court rejects Plaintiffs' attempt to challenge NWP 56 on these bases.  The Corps is entitled to summary judgment on Plaintiffs' first and second claims for relief.  *See* Dkt. No. 14 at 79–83.

**E.**   **The Record before the Court Is Insufficient to Determine the Appropriate Remedy for the Corps' APA Violation.**

As explained above, the Court finds that Plaintiffs have prevailed on their claims that NWP 56 is unlawful because the Corps did not comply with all applicable procedural safeguards required under the RHA and NEPA before issuing it.  The parties dispute whether, in light of the Court's conclusion, NWP 56 should be vacated outright or whether it should be left in place while the matter is remanded to the Corps for revision.  *Compare* Dkt. No. 63 at 40–41, *with* Dkt. No. 65 at 32–34.

The Ninth Circuit has held that courts are not "required to set aside every unlawful agency action," and retain discretion to fashion an appropriate equitable remedy.  *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)).  "Full vacatur is the ordinary remedy when a rule violates the Administrative Procedure Act, and courts deviate 'only when equity demands.'"  *Coalition*, 843 F. App'x at 80 (quoting *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Although the Corps acknowledges that the Ninth Circuit has held that vacatur is the presumed remedy for a violation of the APA, the Corps contends that any vacatur should be narrowed to address the specific harms established by Plaintiffs. Dkt. No. 62 at 52. According to the Corps, because Plaintiffs "have not identified any NWP 56-authorized projects that are causing them harm[,] [a]ny remedy should therefore be limited to declaratory relief and remand." *Id.*

Indeed, the record before the Court does not reference any specific projects authorized under NWP 56. At oral argument, Plaintiffs stated that no projects have been authorized under NWP 56 as of that date (Dkt. No. 70 at 12), but the Corps referenced four facilities currently operating under NWP 56 (three in Alaska and one in Puget Sound, and the latter was authorized before NWP 56 was issued and retroactively permitted under NWP 56). *See id.* at 18. The Corps acknowledged that the record before the Court does not address these projects. *Id.*

Without any information in the record as to the number of projects currently in operation or set to be operational in the future, the Court has no basis to evaluate the extent of any disruption that would occur if NWP 56 is vacated. This void hampers the Court's ability to determine whether equity demands a departure from the ordinary vacatur remedy. As such, the Court cannot determine the appropriate remedy at this time. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (instructing courts to consider, when deciding whether to depart from the presumptive remedy of vacatur, the seriousness of an agency's errors and "the disruptive consequences" that would result from vacatur).

The Court instructs the parties to meet and confer to discuss whether the remedy issue should be decided by the Court via supplemental briefing, a bench trial, or some other method. No later than October 18, 2024, the parties shall file either a stipulated motion on this issue, or if agreement cannot be reached, the parties may file a joint status report proposing a schedule for resolution of this issue.

### III.   CONCLUSION

For the reasons explained herein, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment (Dkt. No. 44) and GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (Dkt. No. 62).  Although the Court finds that Defendants are entitled to summary judgment on Plaintiffs' first two claims, Plaintiffs have prevailed on their third and fourth claims leading the Court to conclude that NWP 56 is unlawful. As such, no new activities shall be permitted under NWP 56 in its current form.  As explained in the previous section, the Court ORDERS the parties to file either a stipulated motion or a joint status report proposing a method for final determination of the appropriate remedy no later than October 18, 2024.

Dated this 30th day of September, 2024.

Kymberly K. Evanson
United States District Judge